Argued at Pendleton May 8, reversed July 17, 1923.

## STREET *v.* RINGSMYER.

(216 Pac. 1017.)

**Waters and Watercourses—Land Owner may Prevent Influx of Water Caused by Irrigation Operations.**

1. A land owner may erect an obstruction to prevent the influx of water caused by another's irrigation operations.

**Waters and Watercourses—Party Diverting Water Responsible for It While Out of Wonted Channel.**

2. Generally one who diverts water from its natural course is responsible for it while thus out of its wonted channel.

From Grant: DALTON BIGGS, Judge.

In Banc.

REVERSED.

For appellant there was a brief and oral argument by *Mr. Errett Hicks.*

For respondent there was a brief and oral argument by *Mr. Otis Patterson.*

BURNETT, J.—The plaintiff is the owner of a tract of land on the John Day River in Grant County. To gain access to the county road south of his lands, he purchased a roadway running in the direction of the public highway along the east boundary of land owned by the defendant. Immediately south of plaintiff's lands and east of his roadway lies a tract owned by one Sterritt. The river runs northerly and westerly through the plaintiff's lands. What is known as Max Robinson's Slough heads near the river southeast of plaintiff's lands, flows in a general

---

1. Right to embank against flood or overflow, see notes in 4 Ann. Cas. 718; 16 A. L. R. 629; 22 A. L. R. 956.

2. Liability for overflow from artificial channel by which stream is diverted from its natural channel, see notes in 12 A. L. R. 187; 36 L. R. A. (N. S.) 1158; L. R. A. 1916F, 1291.

westerly course until it enters the land of Sterritt, where it turns north until it reaches nearly to the plaintiff's land where it again turns toward the northwest through the southern part of his land. He avers in substance that his roadway, mentioned, crosses a slough or waterway which runs westerly through the lands of Sterritt and the defendant and ultimately into the Max Robinson Slough west of the plaintiff's land and that this slough drains the surface water from lands lying above the roadway. He says that in order to make the roadway passable at all seasons, he was compelled to and did improve it by raising the surface and putting in a culvert sufficient to accommodate all the surface water naturally running there. The particular grievance of which he complains is thus described in the complaint:

"That at some time during the spring of the year 1920, while the plaintiff was absent from home and without the knowledge or consent of the plaintiff, the defendant, Henry Ringsmyer, wrongfully and unlawfully, entered upon the said slough or water way at a point a few feet west of plaintiff's said roadway and constructed a dam across the entire width of the said slough or water way and thereby damming up the waters thereof completely and causing the same to back up and overflow the plaintiff's said roadway for a width of from thirty to fifty yards."

After charging that the act of the defendant has made the road impassable and that he threatens to continue to maintain the dam, the plaintiff asserts that he was damaged in the sum of $300 and, having no adequate remedy at law, prays for a decree enjoining the defendant from maintaining the dam or in any way obstructing the flow of water through the slough which he mentions. The answer admits the ownership of the various properties mentioned in

the complaint, denies the existence of the slough and the infliction of any damage upon the plaintiff. Substantially, the answer charges that what the plaintiff calls a slough is a mere swale in which surface waters gather and are discharged finally into the John Day River and that the presence of the water on the plaintiff's road arises from the fact that a dam has been placed in the Max Robinson Slough on the land of Sterritt whereby the slough overflows and the water is caused, not only to irrigate the lands of Sterritt but of the plaintiff as well, and that the surplus water therefrom flows down across the road-way upon the defendant's land contrary to the natural flow of the water if the dam were not placed in the Max Robinson Slough. The origin of the water as stated in the answer is denied by the reply. When the cause was at issue, it was referred to a referee who reported the testimony to the court which made findings and a decree in favor of the plaintiff and the defendant appealed.

Briefly stated, the contention of the plaintiff is that the defendant has dammed up and interfered with the natural flow of surface water, setting the same back over the plaintiff's roadway, to his irreparable injury. The following definition of surface water found in *Crawford* v. *Rambo,* 44 Ohio St. 282 (7 N. E. 429), was quoted with approval by Mr. Chief Justice BEAN in *Price* v. *Oregon R. R. Co.,* 47 Or. 350, 358 (83 Pac. 843):

"Surface water is that which is diffused over the surface of the ground, derived from falling rains or melting snows, and continues to be such until it reaches some well-defined channel in which it is accustomed to, and does, flow with other waters, whether derived from the surface or springs; and it

then becomes the running water of a stream, and ceases to be surface water.''

The testimony is very clear that at the time of the grievances complained of, what is called a slough or waterway in the complaint was nothing else than a very shallow depression in the ground without any banks, was covered with turf and grass, and was used for pasture by the defendant. It was not in any sense of the word a well-defined stream at any time of the year.

The common-law rule respecting surface waters is thus stated in *Bowlsby* v. *Speer,* 31 N. J. Law, 351 (86 Am. Dec. 216), by Mr. Chief Justice BEASLEY:

"It is not one of the legal rights appertaining to land that the water falling upon it from the clouds shall be discharged over land contiguous to it; and this is the law, no matter what the conformation of the face of the country may be, and altogether without reference to the fact that, in the natural condition of things, the surface water would escape in any given direction. The consequence is therefore that there is no such thing known to the law as a right to any particular flow of surface water *jure naturae.* The owner of land may, at his pleasure, withhold the water falling on his property from passing in its natural course on to that of his neighbor, and in the same manner may prevent the water falling on the land of the latter from coming on to his own. In a word, neither the right to discharge nor to receive the surface water can have any legal existence except from a grant, express or implied. The wisdom of this doctrine will be apparent to all minds upon very little reflection. If the right to run in its natural channels was annexed to surface water as a legal incident, the difficulties would be infinite; indeed, unless the land should be left idle, it would be impossible to enforce the right in its rigor; for it is obvious every house that is built and every furrow that is made in a field is a disturbance of such right. If

such a doctrine prevailed, every acclivity would be and remain a watershed, and most low ground become reservoirs. It is certain that any other doctrine but that which the law has adopted would be altogether impracticable. * *

"The legal principle as above stated is fully established in the following cases": (stating many precedents).

This statement of the common-law doctrine was approved by Mr. Justice BREWER, then of the Supreme Court of Kansas in *Gibbs* v. *Williams*, 25 Kan. 214 (37 Am. Rep. 243). The common law regards surface water as a common enemy which one may appropriate, if on his premises, or may repel, or send on its natural way, as he pleases; and that, not until by flowing into a well-defined channel, do its waters assume that character in which riparian owners may demand that it shall run in its accustomed course.

There has been a great conflict of precedents in the United States about whether the common-law rule or that of the civil law respecting surface waters shall prevail. The question was not definitely settled in this state until the case of *Rehfuss* v. *Weeks,* 93 Or. 25 (182 Pac. 137), followed by *Harbison* v. *Hillsboro,* 103 Or. 257 (204 Pac. 613), in both of which the opinions were written by Mr. Justice BEAN. The precept is thus stated by him in the latter case:

"The rule that would best serve in this state, and tend to promote the interest of the people without causing undue hardship, would be to allow the owner of land to turn upon the land of an adjacent owner surface water in such quantities as would naturally drain in that direction by means of artificial drainage even though the flow of such water upon the lower tract is accelerated; due regard being observed for the interest of the adjacent owner so as to cause no unreasonable inconvenience."

108 Or.—23

The latter doctrine would control this case and lead to an affirmance of the decree of the Circuit Court, if, indeed, the plaintiff by his testimony had sustained his allegation that the water set back upon his roadway was, in very truth, surface water. The testimony shows that besides the Max Robinson Slough, dammed up for the purpose of irrigating the lands east of and adjoining the plaintiff's roadway, there are two other possible sources, other than mere surface water, from which water might come to the roadway in question. They are what is called the Ringsmyer Ditch which is taken out of the John Day River far above all the lands herein mentioned and brought down across the southwestern corner of Sterritt's land and through the premises of the defendant practically parallel with what the plaintiff calls the slough; and another ditch taken out of the Ringsmyer Ditch and running around upon the land of Sterritt where it goes under the Ringsmyer Ditch and is used for irrigation by Sterritt. It is manifest that the water from either of these three sources does not constitute surface water, for they are caused to flow there by artificial means.

Bearing in mind that the allegation which the defendant was called upon to answer was, "interference with surface water," we remember the rule that the proofs must correspond with the allegations. At the trial, according to the record, the matter of surface water as such in its legal sense, was entirely abandoned and the effort of the plaintiff and his witnesses was to show that the water which the defendant set back by his dam was that coming from the defendant's own ditch. When the plaintiff himself was on the stand as a witness, the counsel for the defendant propounded this question to him:

"Q. * * What is the source of that water that flows across your roadway?

"A. Well, I am sure I could not say altogether, mostly I think comes from irrigation above, seepage water."

Further on he testifies thus:

"Q. Does any part of your own water escape to the lands of Ringsmyer?

"A. A little seepage water, runs in gopher holes, which you cannot prevent."

No charge is made in the complaint against the defendant, that he set back upon the roadway water which he, himself, caused to flow there. Naturally the complaint would fail for want of proof sustaining allegations there made in view of such testimony as that of the plaintiff, quoted above.

From the evidence, it is impossible to determine with any degree of certainty whether the water which came there was from the Max Robinson Slough, the Sterritt Lateral, or what is known as the Ringsmyer Ditch; or whether or not all of these sources contributed to the result. That it was not simply surface water is manifest from the fact that the country thereabout, although in the bottom lands along the John Day River, is for the most part, in the later spring months and during the summer, arid, requiring irrigation for successful farming.

1. The suit was begun August 4, 1920, when irrigation was going on and, in good reason, the water at that time could not have been surface water. If the water that came down to the defendant's premises was not surface water, but such as was sent there by Sterritt's irrigation, either from his lateral or from the Max Robinson Slough, or if it was caused by the plaintiff's irrigation operations, the defendant

would have a right to repel it. If it worked damage to the defendant's lands, as he said in his answer, by making it swampy and unfit for cultivation, it would amount to a nuisance and he would have a right to abate it by erecting barriers against it, for it is said in *Turner* v. *Locy,* 37 Or. 158, 162 (61 Pac. 342):

"The rule is well settled that a party may abate a private nuisance upon his own motion, after notice, when necessary, provided he does so without disturbing the peace, does as little injury as possible, and removes so much of the thing only as causes the nuisance, whenever he can maintain an action for the injury caused thereby, though the damages resulting therefrom be nominal only."

2. That the owner of land may erect an obstruction thereon to prevent the wrongful influx of water upon the same is taught by *Beard* v. *Murphy,* 37 Vt. 99 (86 Am. Dec. 693); *Gross* v. *Lampasas,* 74 Tex. 195 (11 S. W. 1086); *Barnett* v. *Matagorda Rice & Irr. Co.,* 98 Tex. 355 (83 S. W. 801, 107 Am. St. Rep. 636); *Lessard* v. *Stram,* 62 Wis. 112 (22 N. W. 284, 51 Am. Rep. 715); *Simon* v. *Nance,* 45 Tex. Civ. App. 480 (100 S. W. 1038); *Schmitz* v. *Ort,* 92 Ill. App. 407; *Hurdman* v. *N. E. Ry. Co.,* L. R. 3 C. P. Div. 168. It is true that some of these cases treated of surface water, enforcing the common-law rule. Nevertheless, as applied to water which is not surface water but is sent against a man's lands through artificial means, the principle is the same and his right to defend his premises is reasonable and unquestionable. He is not compelled to resort to litigation if he can work out his desired relief by peaceable means. He is in a position analogous to the man who threw off from his person the lighted squib which originally had been thrown by another into a crowd. In such an in-

stance, if the plaintiff would recover, he must attack the man who caused the water to flow there when it would not naturally have done so. As a general rule, the one who diverts water from its natural course is responsible for it while thus out of its wonted channel: *Mallett* v. *Taylor,* 78 Or. 208 (152 Pac. 873).

Again, if the charge related to water that was brought to the plaintiff's roadway by artificial means and the defendant had been accused by the plaintiff of bringing it there, still the state of the testimony, after careful reading, discloses a situation where it is a mere guess as to whether the water came from the Ringsmyer Ditch, the Sterritt Lateral, or the Max Robinson Slough. As stated by Mr. Justice McBride, *Spain* v. *O.-W. R. & N. Co.,* 78 Or. 355, 369 (153 Pac. 470, Ann. Cas. 1917E, 1104):

"When the evidence leaves the case in such a situation that the jury will be required to speculate and guess which of several possible causes occasioned the injury, that part of the case should be withdrawn from their consideration": Citing *Armstrong* v. *Town of Cosmopolis,* 32 Wash. 110 (72 Pac. 1038).

In brief, there is an utter failure of proof of the allegation that the defendant interfered with the flow of surface water so as to make him liable under the rule of the civil law adopted in this state. If the water was brought upon his premises by artificial means, for which he was not responsible, he had a right to defend his premises against it by erection of an embankment thereon. If we should consider the matter on the basis of the water being brought to his premises by artificial means, the testimony leaves it uncertain whether he was to blame for it or not, in which case the plaintiff has not sustained the burden of proof. The conclusion is that the de-

cree of the Circuit Court should be reversed and the suit dismissed without prejudice to any other cause of suit actually existing in favor of the plaintiff against the defendant; for it may be that the defendant is at fault, not for defending his land from surplus irrigation water, but for bringing such water to the *locus in quo*. The writer hopes for pardon in suggesting that the situation disclosed by the record is one in which concession and compromise and helpfulness among neighbors will work out more good to them than litigation and reprisals.

REVERSED AND SUIT DISMISSED.