Argued December 12; affirmed December 31, 1935

## ALLEN *v.* K. P. TIMBER COMPANY
### (53 P. (2d) 29)

*Nicholas Jaureguy,* of Portland (Jaureguy & Tooze and Wilson & Reilly, all of Portland, on the brief), for appellant.

*Arthur I. Moulton,* of Portland (Edward F. Fisher, of Clatskanie, and William P. Lord, of Portland, on the brief), for respondent.

CAMPBELL, C. J. This is an action brought by the administrator of the estate of one Milo C. Allen, deceased, for damages for the death of the administrator's

decedent. On the trial in the circuit court, there was a verdict and judgment for plaintiff. Defendant appeals.

The court's refusal to grant an involuntary nonsuit and to direct a verdict for defendant on the ground that no actionable negligence has been shown is the first two assignments of error. The first nine assignments of error are all embraced in the first two, that is, a disposition of the first two automatically disposes of the next seven.

On December 25, 1933, and for some time prior thereto, the deceased and his family were living in a house on a tract of land situate in Columbia county about one mile easterly of the town of Kerry. The house was located about 75 feet south of the Lower Columbia River Highway, and close to a small stream of water known as OK creek. On the above date, an immense wall of water carrying rocks, earth, logs and timbers, came down the creek gorge overflowing the banks of the stream and spread over the land, destroyed the house and killed deceased.

The defendant, on that date, was the owner of a railroad running from the town of Kerry in a general southerly direction for a distance of 31 miles through a precipitous mountainous country cut with many deep canyons. The railroad intersected OK creek about one mile and one-third upstream from the residence of deceased. It was built across OK creek on a pile-trestle bridge 250 feet long and 90 feet high above the bed of the stream. The walls of the canyon or gorge through which the stream flows at that point, and for some distance above and below the bridge, are mostly rock and very precipitous—in some places almost perpendicular. The bed of the stream has a steep descending grade and the water flows rapidly.

After the railroad had been constructed, the canyon under the bridge across OK creek was filled with earth, mostly sand, taken from other parts of the roadbed until it was filled up to nearly the top of the trestle. The intention of the builder and owner was to eventually supplant the trestle bridges with fills. The fill was made by hauling the material from other parts of the roadbed in dumpcars and dumping it from the track on the trestle. The process of filling extended over a five-year period. At the time of the accident, the fill had settled to a height of about 60 feet. To take care of the flow of the stream, a 14-inch corrugated iron culvert was enclosed in a wooden crib in the bottom of the fill. The base of the fill was about 200 feet wide up and down stream.

During the months of November and December, 1933, the rainfall in that locality was more continuous than usual and the ground became well saturated, causing slides and washouts. On December 21, 1933, the water began rising in the canyon above the fill. On the morning of December 25, the water had risen to a depth of somewhere between 20 and 40 feet. Under this pressure, the fill suddenly gave way carrying a large part of the bridge with it. A wall of water and debris came down the canyon, overflowed the banks, spread out over the flat land, doing the damage alleged in the complaint.

Defendant became the owner of the railroad by purchase in the year 1925. The evidence shows that in the winter of 1920-21 the culvert in the said fill became obstructed and the water backed up. When the water reached a depth of 10 or 15 feet, the then owner, realizing the danger, put a steam pump to work and discharged it over the fill until it was reduced so that the obstruction could be removed. The obstruction, at that time, was a stump that had floated down stream and

lodged at the intake of the culvert. In order to prevent a similar occurrence, small cedar piling were driven about 10 feet from and around the intake of the culvert. This piling was fastened together at the top so as to form a sort of weir or screen and thus prevent accumulation of debris against the opening of the culvert.

Sometime before December 25, 1933, this screen disappeared—either having rotted out or was removed. After the accident, parts of the culvert were examined and were found choked—mostly with impacted earth. The record does not disclose what parts of the culvert were so examined or if it was so choked all the way through.

■ The real question presented is found in the first assignments of error. The contention of defendant is that the exceptionally heavy rainfall that occurred during the months of November and December, 1933, could not have been reasonably foreseen. Granting that this contention is true, it could have been foreseen that the culvert under the fill might become choked, as it had been in 1921, and thereby impound a large quantity of water which the fill was in no condition to withstand. It was not intended to use the fill as a dam.

The preponderance of the evidence is, and there can be but little doubt but, that the breaking of the fill and the sudden releasing of the large quantity of water was the proximate cause of the death of deceased.

The screen at the intake of the culvert had been destroyed or removed long before the time of the accident. Defendant, through its tunnel watchman and section foreman, knew, on December 21, that the water was being impounded, but made no effort to release the water gradually, and failed to warn any one living below the fill. The evidence is to the effect that from where the fill went out, down to its mouth, the stream

bed and the walls of the canyon were scoured to bed-rock; all the ferns and undergrowth were carried away; that for some distance above the fill there was no evidence of a landslide or a scouring or washing away of the shrubbery or undergrowth. Where the water was impounded the ferns and undergrowth were flattened out. There is no evidence of a cloudburst or sudden downpour in the drainage above the fill—just a continuous, steady rainfall. This is shown by the fact that the water was rising behind the fill for three or four days before the accident.

In *Crawford v. Cobbs & Mitchell Company*, 121 Or. 628 (253 P. 3, 257 P. 16), the facts were that the defendant maintained, in connection with its sawmill, a dam across the Siletz river near its source. During the month of November, 1921, there was a severe and unusual storm and a very heavy rainfall, causing the river to overflow its banks and defendant's dam. The dam was equipped with a floodgate 18 feet wide. When the water began to overflow the dam, the defendant opened the floodgate releasing a large quantity of water which raced down the stream and overflowed plaintiff's land 40 miles below. This court, in passing upon the question of defendant's liability said that certain principles of law were well-settled, and one of these principles was that defendant ". . . had no right, after having impounded the water, to release it in larger quantities than were then flowing into it from above thereby adding to the normal flow of water so released by their act in raising the floodgate".

We can see no difference in principle in lawfully impounding waters and releasing them suddenly than in negligently permitting large quantities to be impounded and being suddenly released by the breaking of the impounding agency. What has happened once

may reasonably be expected to occur again under similar conditions. Defendant knew, or by the exercise of reasonable diligence could have known, that the culvert under the said fill became choked in the year 1921; that the waters rose very rapidly; that it was necessary to build and maintain a screen around the intake of the culvert to prevent it from choking. The defendant failed to maintain such screen and permitted the culvert to become choked, and now seeks to evade liability on the theory that a reasonably prudent person could not foresee that what happened before was likely to recur—probably under the theory that lightning seldom strikes twice in the same place.

> "The thing that hath been, it is that which shall be;
> And that which is done is that which shall be done,
> And there is no new thing under the sun."

Even if defendant could not foresee that the culvert might become choked and thereby impound water, it did know that on December 21, 1933, the water was being impounded for three or four days before the breaking of the fill, yet did nothing to relieve the situation. There may have been no practical way of opening the choked culvert after the water had raised, but defendant's predecessor found a very practical way of getting rid of the water pressure against the fill by pumping the water over and discharging it below the fill.

"577a * * * Floods such as from climatic and geographical conditions may reasonably be expected, whether of frequent or infrequent occurrence, must be taken into consideration in estimating hazards attending the obstruction of water courses. The term 'act of God', in its legal sense, applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them. And that rule must be

182

regarded as the proper one. The Illinois court of appeals held that extraordinary floods are those not occurring annually. But the mere fact that a flood does not occur annually will not make it an extraordinary one, if, from the climatic conditions and the character of the country, it is likely to occur, and has been known to occur, with sufficient frequency to warn those living in the vicinity that it is likely to occur at any time. The question whether a flood is ordinary or extraordinary is in most cases for the jury.

"577b. One constructing an obstruction to a water course cannot relieve himself from liability for injuries caused by damming the water back on upper property by the fact that the injury occurred during an extraordinary flood, if he was negligent in the performance of the work so that unnecessary injury was done by the flood. But to render him liable, his negligence must have been an active agent in bringing about the loss, without which it would not have occurred. An embankment obstructing the flow of a water course is an efficient cause of the flooding of adjoining lands, when, in concurrence with an unusual rainfall, it increased the volume of the overflow and the extent of the injury to the land and the crops. The construction of a railroad embankment in a manner that cuts off 80 per cent of the passage of freshet water is a negligent disregard of the right of landowner to have water flow past his land in its natural way without being retarded or concentrated and poured through with increased force. In an action against a railroad company for the flooding of adjoining land, alleged to have been caused by the defective construction of its embankment over a natural stream, it is a question of fact for the jury whether such flooding was due wholly to such an extraordinary flood as ordinary prudence could not have anticipated, or wholly to the defective construction of such embankment, or to both causes." Waters and Water Rights, Farnham, Volume II, §§ 577a, 577b.

It being a question for the jury to determine whether a reasonably prudent person would have foreseen that

the culvert was insufficient to carry off the waters, either by becoming choked or by being too small, the court did not err in submitting the question to the jury, nor in the instruction given.

The above disposes of the first nine assignments of error, they being all based upon whether plaintiff produced testimony tending to establish actionable negligence on the part of the defendant which was the proximate cause of the alleged damages.

The appellant contends that the court erred in submitting to the jury the plaintiff's alleged cause of action for the destruction of personal property, claiming there is no evidence of the destruction or value of the property alleged to have been destroyed.

In addition to a verdict in favor of plaintiff for the death of the deceased, the jury returned a verdict for plaintiff on her second cause of action for the destruction of the personal property, in the sum of $1,500. The evidence introduced is perhaps not of the highest quality, regarding the value of the property destroyed. There is no doubt as to the several items, or of their destruction, and there was some competent evidence, received without objection, tending to show that the value was even greater than the amount of the verdict for which judgment was entered. This court will, therefore, not disturb the verdict or judgment on that cause of action.

The fact that it was difficult to prove the value of the household furniture, the family provisions, and an automobile, which were totally destroyed, does not relieve the plaintiff from the necessity of establishing the value. Neither does it excuse the defendant from liability that plaintiff, in the very nature of things, was unable to produce the highest quality of evidence to prove the value of things no longer in existence. One

witness testified that he knew every article of personalty contained in the house, and in the aggregate they amounted in value to more than $1,500. This testimony was received without objection.

The learned circuit court did not err in submitting this question to the jury.

The judgment of the circuit court will be affirmed. It is so ordered.

BEAN, BAILEY and RAND, JJ., concur.