Argued October 27, 1952, affirmed January 28, petition for
rehearing denied March 11, 1953

# WELLMAN ET UX. *v.* KELLEY and HARRISON

252 P. 2d 816

*P. J. Gallagher* argued the cause for appellants. On the briefs were Gallagher & Gallagher, of Ontario, Austin Dunn and Dunn & Jackson, of Baker.

*Blaine Hallock* argued the cause for respondents. On the brief were Hallock, Banta, Silven & Horton, of Baker.

Before BRAND*, Chief Justice, and ROSSMAN, LUSK, LATOURETTE** and WARNER, Justices.

## WARNER, J.

Plaintiffs Wellman seek to restrain defendants from obstructing the natural flow of the flood waters of Powder river. From a decree in favor of plaintiffs, defendants appeal.

---

*Chief Justice when this case was argued.
**Chief Justice when this opinion was rendered.

Powder river flows in a northerly and northwesterly direction through plaintiffs' ranch in Baker county. The defendant Harrison is the owner of a substantial parcel which adjoins the Wellman premises on the west. The defendant Kelley is his lessee. The land comprising the Wellman and Harrison ranches is dry and arid in its natural state; but with the aid of irrigation, partly by flooding and partly by artificial means, it is productive of crops of hay and grasses.

Powder river is a non-navigable, perennial stream which is relatively level at the points where it touches the Wellman ranch. During the months of March and April of each year, the rains of spring, together with the waters from the melting snows of winter, greatly augment the river's main stream. It is then so increased that the river's normal or summer channel cannot carry all the water, with the result that during that period it overflows its west bank at a point on the Wellman ranch. This overflow is further increased by surface waters accumulated on the latter property from snow and rain that fall upon that parcel.

It is plaintiffs' contention that these excess waters, together with the waters on the Wellman place which mingle with them, have, from time immemorial, coursed thence in a generally northwesterly direction in a flood channel following a series of ancient, natural depressions consisting of sloughs, swales and swamps, including a small body of water on the Wellman property known as Goose lake. From the latter body it continues northwesterly across the Wellman and Harrison properties until the waters again join the main channel of Powder river at a point on what is known as the Hankins or Coffey property, further to the north and west of the lands in controversy.

The plaintiffs assert that what is above described as the natural spring or flood channel for the seasonal overflow from Powder river is as ancient and well established as the normal channel of the river itself and as such constitutes a natural drainage system.

Prior to March, 1951, this spring flood channel had never been obstructed. It was then the defendants constructed a tight, earthen dike or barricade along the east boundary of the Harrison ranch. This dike followed that boundary line to a point at the northerly end of the defendants' property and at a place where the defendants had a concrete headgate. This barricade impeded the natural northwesterly flow of the excess water as it coursed across plaintiffs' property to reach lower levels on the contiguous lands of others, including the defendants, and caused the water to stand on plaintiffs' meadowlands for about three weeks. Goose lake, an integral part of this flood channel, normally covered an area of three acres but, by reason of defendants' obstructions, was expanded so that the flood waters covered between forty and fifty acres of the Wellman hay land.

In short, the dike and other erections of defendants acted as a dam which converted the Wellman land into a species of reservoir for the impounding of the spring overflow from Powder river and there holding the same in reserve for defendants' use and convenience as water for the irrigation of the Harrison ranch. The concrete headgate, originally constructed as a control for normal irrigation waters, now became a sort of spillway in the dike for the release of the excess waters held back on plaintiffs' property, but only when and to the extent that defendants desired to accomplish that result. This they effected by the removal of board inserts.

The question which here presses for solution is: Can the owner of adjacent and lower property repel surface waters or flood waters which originate upon the premises of an upper owner, if, in so doing, he creates a nuisance to the damage of the upper proprietor? We also have as a corollary to that question a further one. It is: Are the rights of the lower neighbor to be determined by rules of common law or civil law?

The defendants seek to make a distinction between the rules governing the repulsion of the flow of what the law knows as "surface waters" and "flood waters." Their over-all error, as will be later demonstrated, lies in their failure to distinguish between ordinary and extraordinary flood waters. Instead of two classifications of offending overflows, that is, surface and flood waters, there are, in fact, three. They are excess surface waters, *ordinary* flood waters and those which come unexpectedly and are known as *extraordinary* flood waters. These three classifications, as exemplified by the facts present in the case at bar, must be kept in mind as an essential to a proper understanding of the rules of law peculiarly applicable herein.

Before proceeding further, it may be well to dispose of a matter in the interest of clarifying what we will hereinafter say. It relates to the irrigation rights of the parties. The normal irrigation season for the lands here involved commences long after the March and April overflows occur. Such water rights as either party may rightfully claim under the earlier adjudication of rights in the waters of Powder river are unaffected by any disposition of the waters overflowing in the spring season; and we, therefore, dismiss from further consideration as immaterial and

untenable any representations made by defendants that the dike or other structure erected by them to control the spring overflow has any necessary relation to their adjudicated irrigation rights or irrigation problems.

This court has heretofore given definition to the several kinds of water which here engage our interest or has furnished a basis for the justification of certain definitions and distinctions hereinafter employed.

■ Surface water, we learn from *Price v. Oregon Railroad Co.,* 47 Or 350, 358, 83 P 843 (1906), " 'is that which is diffused over the surface of the ground, derived from falling rains or melting snows, and continues to be such until it reaches some well-defined channel in which it is accustomed to, and does, flow with other waters, whether derived from the surface or springs * * *.' " When this commingling is accomplished, it ceases to be surface water and becomes the running water of a stream. *Street v. Ringsmyer,* 108 Or 349, 351, 216 P 1017. Also see *Skinner v. Silver,* 158 Or 81, 98, 75 P2d 21.

■ In the recent case of *Schweiger et ux. v. Solbeck et ux.,* 191 Or 454, 230 P2d 195, we had occasion to give a definition to extraordinary flood waters, saying, at page 464:

> "* * * An extraordinary flood is one 'whose comings are not foreshadowed by the usual course of nature, and whose magnitude and destructiveness could not have been anticipated or provided against by the exercise of ordinary foresight.' 13 Am. & Eng. Enc. Law, 2d ed, p 687; Jefferson v. Hicks, 23 Okla. 684, 102 P. 79, 24 L.R.A., (N.S.) 214, 218. See also Allen v. K. P. Timber Co., 152 Or. 176, 181, 53 P.2d 29."

While we have not yet given such a precise definition

to "ordinary flood waters," we have recognized the distinction between an ordinary and extraordinary flood. *Allen v. K. P. Timber Co.*, supra, 152 Or 176. In *Schweiger et ux. v. Solbeck et ux.*, supra, we inferentially supplied a definition of an ordinary flood when discussing a heavy rainfall of flood proportions and there said, at page 464:

> "Taking into consideration the heavy rainfall which is normal in the area involved in this case, it is impossible to conclude from the evidence that that which immediately preceded the disaster was at all extraordinary. It was a heavy rain, but not of unprecedented proportions. In its occurrence and magnitude, it might have been anticipated by a person of reasonable prudence. * * *."

The foregoing statement accords with the following definition of flood waters found in 56 Am Jur, Waters, 574, § 91, which we adopt as our own:

> "Floods are generally classified as ordinary or extraordinary, such terms being used with reference to both the time of occurrence and the magnitude of the flood. Those which occur annually, or at certain seasons, or at other regular intervals, and which are not of unprecedented magnitude, are generally regarded as ordinary; while those which occur at irregular times or intervals may be either ordinary or extraordinary, depending upon their cause or magnitude. A common test of the character of a flood as ordinary, rather than extraordinary, in any case is whether its occurrence and magnitude should or might have been anticipated, in view of the flood history of the locality and the existing conditions affecting the likelihood of floods, by a person of reasonable prudence. * * *."

However, we are not, as a matter of fact, here dealing with extraordinary flood waters, that is, a rising of the stream beyond the confines of banks caused

by some unusual and unexpected event, such as might eventuate from the destruction of a dam or a cloud-burst of magnitude. Such unanticipated appearances of water in volume constitutes a "common enemy" and may be repelled by the owner of lands over which the water flows. Here the flood waters are seasonal and expected and have been reoccurring at substantially the same periods of the year and in approximately the same volume.

■ We conclude that the waters which are the source of this litigation in part fall within the category of surface waters but in the main part are *ordinary* flood waters. The term, "ordinary flood waters", properly describes both the foregoing separate classifications when the surface waters on the Wellman place formed from rains and melting snow join with and become a part of the spring overflow from Powder river. In-deed, for this reason we will hereafter refer to all the waters arising upon and coursing across the Well-man property in search of an outlet as *ordinary* flood waters. It, therefore, follows that no rules of law which give an owner of adjacent lower premises the right to repel the surplus waters from an *extraordinary* flood have any applicability here.

When we resolve the conflicting legal concepts of the parties into terms of the actualities of the present matter, we find defendants contending that they had a right to obstruct the flow of the spring flood water over their premises merely because they were flood waters and without regard to whether they were *ordinary* or *extraordinary* in character. On the other hand, it is the position of plaintiffs that the waters in question are only ordinary flood waters and, as such, defendants have no right to block their run-off from plaintiffs' lands onto that of defendants when, in so

doing, plaintiffs are damaged thereby. They claim that their position gains additional emphasis when, as here, the flood waters follow an ancient and well-defined channel in their return to the parent stream. Such waters, the plaintiffs argue, are not a "public enemy" in the sense which would exonerate the defendants from diverting their flow or impounding them on plaintiffs' property by barriers erected on defendants' land.

■ Two rules prevail with reference to the right of a contiguous owner of lower property to repel ordinary flood waters and surface waters overflowing from the higher to the lower property. One rule, having its origin in the common law, materially enlarges the right of a lower owner to so protect his property from such unwelcome inundations. The rule which rests upon the civil law favors the upper-land proprietor and inhibits the lower owner from obstructing the run-off, especially when following a natural course or flood channel over the latter's land. Oregon, as we shall see, is committed to the rule predicated upon the civil law.

■ For an excellent statement of the common-law rule, see that of Mr. Chief Justice Beasley in *Bowlsby v. Speer*, 31 NJL 351, 86 Am Dec 216, and cited in *Street v. Ringsmyer*, supra, 108 Or 352. In essence, it denies to an owner of one parcel the right to discharge the accumulated waters on his premises over the contiguous parcels owned by another " 'no matter what the conformation of the face of the country may be, and altogether without reference to the fact that, in the natural condition of things, the surface water would escape in any given direction.' "

■ There was a long period of uncertainty and doubt in this state as to whether this jurisdiction had embraced the civil rule or the common-law rule. Concern-

ing this, Mr. Justice BURNETT says in *Street v. Rings-myer,* supra, at page 353:

"* * * The question was not definitely settled in this state until the case of Rehfuss v. Weeks, 93 Or. 25 (182 Pac. 137), followed by Harbison v. Hillsboro, 103 Or. 257 (204 Pac. 613), in both of which the opinions were written by Mr. Justice Bean. The precept is thus stated by him in the latter case:

" 'The rule that would best serve in this state, and tend to promote the interest of the people without causing undue hardship, would be to allow the owner of land to turn upon the land of an adjacent owner surface water in such quantities as would naturally drain in that direction by means of artificial drainage even though the flow of such water upon the lower tract is accelerated; due regard being observed for the interest of the adjacent owner so as to cause no unreasonable inconvenience.' "

In *Harbison et ux. v. City of Hillsboro,* supra, 103 Or 272, the following reason for the rule is given:

"The reason, or the theory, of this rule is based upon nature itself, or, in other words, nature has ordained that surface waters should follow the natural slope or contour of the earth's surface, and the civil law has adopted that rule because it is the natural one; Smurr on Farm Drainage, §§ 4, 5; Kauffman v. Griesemer, 26 Pa. St. 407 (67 Am. Dec. 437, 440)."

The firm position which the civil rule enjoys in this state is reflected by our most recent holding in *Levene et ux. v. City of Salem,* 191 Or 182, 229 P2d 255 (1951), where the late Mr. Justice HAY, said, at pages 191-2:

"Under the rule of the civil law in such cases, which has been adopted by most of the courts of this country, including this court, the owner of a tract of land of relatively higher elevation has the right to have diffused surface water flowing or coming

naturally upon his premises pass through the natural channels of drainage onto or over a lower tract. * * *."

In support, he cites *Harbison et ux. v. City of Hillsboro,* supra; and *Rehfuss v. Weeks,* supra, 93 Or 25.

We are not unmindful that in the Harbison and Levene cases the civil rule was there applied to surface waters only. This, however, in our opinion, does not render the holdings in these cases with respect to the applicability of the civil rule to surface waters less apposite to ordinary flood waters when coursing in ancient flood or overflow channels.

■ We revert again to *Price v. Oregon Railroad Co.,* supra, 47 Or 350, where Mr. Justice ROBERT BEAN makes the following statement, at page 359:

" * * * If in times of flood any part of the waters of a stream become separated or disassociated from the main body and spreads out over the adjoining country without following any definite water course or channel, it ceases to be a part of the stream and may be regarded as surface water * * * [citing cases]. But, so long as the waters form one continuous body, flowing in the ordinary course of the stream and returning to the natural channel as they recede, they are, properly speaking, waters of a water course, although not confined to the banks of the stream."

■ In 56 Am Jur, Waters, 510 § 18, we find this cogent statement concerning the right of a lower proprietor to obstruct the natural flow of waters:

" * * * the obstruction of *the natural flow of a stream* is always done at the risk of being answerable in damages to him who sustains a loss thereby. Without the consent of the other proprietors who may be affected by his operations, an upper proprietor has no right unreasonably to interrupt or

retard *the natural flow of water,* to the injury of lower owners, nor has a lower proprietor the right to throw the water back upon the proprietors above * * * ." (Italics ours.)

The inhibition against obstructions by the lower owner is addressed primarily to interference with the "natural flow" through the avenue of a natural watercourse, whether it be continuous or sometimes dry, and when in a course or channel of the kind referred to in *Price v. Oregon Railroad Co.,* supra, or as defined in *Simmons v. Winters,* 21 Or 35, 27 P 7, 28 Am St. Rep 727.

It will be noted, too, in the Harbison case, that the rule there applied to surface waters defines them as those which *"naturally drain"* and that the reason for the rule is built around waters which "follow the *natural slope".* (Italics ours.) Indeed, Mr. Justice BEAN significantly observed, at page 273: "The law of this state favors the drainage of land." This same theory of natural drainage is reiterated in *Levene et ux. v. City of Salem,* supra, where the court, at page 192, speaks of the right to have water "pass through the natural channels of drainage onto or over a lower tract."

We are unable to distinguish in principle between the right of an upper owner to have surface waters flow from his premises across an adjacent lower tract "through the natural channels of drainage" and the right of the same owner to have ordinary flood waters course through ancient flood-water channels from his property and thence across the land of his lower neighbor on its way back to the stream from whence it came. The conduits for both are natural channels of drainage. We, therefore, say, as was said in part in *Harbison et ux. v. City of Hillsboro,* supra, 103 Or 272, concerning

surface waters, that the rule which would best serve in this state and tend to promote the interest of the people without causing undue hardship would be to allow the owner of land to turn upon the land of an adjacent owner ordinary flood waters as would naturally drain in that direction through long-established natural channels and through which such annually re-occurring ordinary flood waters have long coursed on their way to join the parent stream.

This conclusion prompts us to inquire as to what is a natural watercourse.

The standard definition of a watercourse, long ago established by this court and ever since adhered to, was laid down by Mr. Justice LORD in *Simmons v. Winters,* supra, where he said, at pages 41-2:

> " * * * a water course is a stream of water usually flowing in a particular direction, with well-defined banks and channels, but that the water need not flow continuously—the channel may sometimes be dry; that the term watercourse does not include water descending from the hills, down the hollows and ravines, without any definite channel, only in time of rain and melting snow, but that where water, owing to the hilly or mountainous configuration of the country accumulates in large quantities from rain and melting snow, and at regular seasons descends through long, deep gullies or ravines upon the lands below, and in its onward flow carves out a distinct and well-defined channel, which even to the casual glance bears the unmistakable impress of the frequent action of running water, and through which it has flowed from time immemorial—such a stream is to be considered a watercourse and to be governed by the same rules."

Also see *Hildebrandt v. Montgomery et al.,* 113 Or 687, 691, 234 P 267; *Hayes et al. v. Adams et al.,* 109 Or

51, 59, 218 P 933; *Borman v. Blackmon,* 60 Or 304, 309, 118 P 848.

In 56 Am Jur, Waters, 497, § 7, it is said: "* * * It is also held that a stream does not necessarily cease to be a watercourse by spreading over low land before flowing again in a natural channel.

* * *." Such is also the tenor of our holding in *Harrington v. Demaris,* 46 Or 111, 118, 77 P 603, 82 P 14, 1 LRA NS 756, where Mr. Chief Justice MOORE, speaking for the court, said:

> "* * * In the next section the learned author [Gould, Waters 3d, 537, § 264], discussing this question further, says: 'A stream does not cease to be a watercourse, and become mere surface water, because at a certain point it spreads over a level meadow several rods in width, and flows for a distance without defined banks before flowing again in a definite channel.' In Case v. Hoffman, 84 Wis. 438 (54 N.W. 793, 20 L.R.A. 40, 36 Am. St. Rep. 937), it was held that the flowing of water upon and beneath the surface of lands between a natural lake of about sixty acres in extent, and a creek into which they discharge, constitutes a watercourse, where the flow is all in the same direction, and a part of the way along a distinct and plainly marked channel, although for some of the distance it spreads over wide reaches of marsh and swamp lands, and percolates the soil in many and most places between the lake and creek. To the same effect, see Cox v. Bernard, 39 Or. 53 (64 Pac. 860), and Mace v. Mace, 40 Or. 586 (67 Pac. 660, 68 Pac. 737)."

We have also held that the source of a watercourse is immaterial provided that the supply is permanent or at least periodic. *Hildebrandt v. Montgomery et al.,* supra, at page 691; *Brosnan v. Harris,* 39 Or 148, 65 P 867, 87 Am St Rep 649, 54 LRA 628.

The above definition authored by Mr. Justice LORD is epitomized by the following statement of Mr. Justice BURNETT made in *Borman v. Blackmon,* supra, where he said, at page 309: "* * * After the stream has dried up, we can go upon the ground and say, 'Here it flowed; here is the track of the water; in this course the stream habitually runs.' * * *."

When we test the evidence in the instant matter by the standards furnished by the foregoing cases, we find that long prior to 1950, when defendants erected the obstructions sought to be abated, the annual spring flood waters of Powder river which overflowed the banks of that stream upon the property of Wellman followed a natural watercourse or channel across his ranch and then across the Harrison ranch until these waters again united with the parent stream at a point northwest of both the properties last referred to, and that such surplus water had so flowed from time immemorial. Such also is the essence of findings by the circuit court. The long existence of such a natural channel for these waters appears to be an accepted fact on the part of all the parties to this litigation.

To circumvent the argument of plaintiffs, defendants depend almost exclusively upon citations from the state of California: *Mogle v. Moore,* (Cal App) 96 P2d 147; *Horton v. Goodenough,* 184 Cal 451, 194 P 34; *Lamb v. Reclamation Dist. No. 108,* 73 Cal 125, 14 P 625; 26 Cal Jur, Waters, 280, § 493. California, unlike Oregon, is devoted to the common-law rule written early into its case law by *Lamb v. Reclamation Dist. No. 108,* supra (1887), which cites and applies the rule as pronounced by Lord Tenterden in *Rex v. Commissioners,* 8 Barn & C 355. Also see *The Weinberg Co. v. Bixby,* 185 Cal 87, 196 P 25, 29. By reason of the diametrically opposite and basic rules prevailing in Oregon and Cali-

fornia, the cases from the latter jurisdiction cannot be accepted as persuasive here.

Before closing this opinion, we feel it is proper to observe that during the course of the trial a blackboard was freely used and referred to by both parties for the purpose of locating points and lines of major interest. Much of the testimony was no doubt made clearer to the judge below by recourse to this device. Its intended effect there is, however, obscure, vague and indefinite to this court and to such a degree that we found it difficult at times to know precisely what evidence was adduced by some witnesses who were called upon to point to places on this mechanical aid.

Over a long period of years we have had occasion to warn many times against this practice. Our most recent statement was made in *Birks v. East Side Transfer Co.*, 194 Or 7, 38, 241 P2d 120, which we commend to the attention of counsel appearing in this matter and to the profession generally who find it convenient to employ blackboards and similar devices during the course of a trial.

Unless the substance of this admonition is observed, what may otherwise appear to be a meritorious appeal may suffer adversely in this court for want of a clearly recorded presentation of material facts relied upon by the parties appellant.

The decree is affirmed.