Argued December 16, 1937; affirmed January 11, 1938

# SKINNER *v.* SILVER ET AL.

(75 P. (2d) 21)

In Banc.

*A. E. Reames*, of Medford, for appellant.

*George M. Roberts*, of Medford (Wm. M. McAllister, of Medford, on the brief), for respondent.

This is a suit brought in behalf of the Citizens Bank of Ashland, now in liquidation, by Mark Skinner, the present Superintendent of Banks of the state of Oregon, substituted as party plaintiff for A. A. Schramm, the former superintendent, for the purpose of quieting title to certain premises described by metes and bounds in plaintiff's complaint, containing 56.75 acres, more or less, ''together with all and singular the tenements, hereditaments and appurtenances, including water rights, ditch rights and mineral rights, thereunto belonging or in anywise appertaining,'' situated in Jackson county, Oregon.

A. A. Schramm, as the then Superintendent of Banks, took over the assets of the Citizens Bank of Ashland on or about March 12, 1932, by virtue of a resolution which had been passed by its directors, authorizing the placing of the assets of said bank in his hands for the purpose of liquidation, and among the assets which were so turned over to him were certain promissory notes secured by mortgage bearing date of October 25, 1918, executed by the Pompadour Mineral Springs Company, which was a first mortgage against an undivided one-half of the property which is the subject matter hereof, and another promissory note executed by the same corporation to the same bank, secured by mortgage which was a third lien against the property which was the subject matter of the first mortgage, and a first lien against the remaining undivided one-half, both note and mortgage bearing date of March 8, 1923.

It is alleged that there had been pending in the circuit court of Jackson county, Oregon, a suit for the foreclosure of a mortgage held by a Mr. Fauvre, executed by the same corporation, which was a second lien against the first undivided one-half of said property, and in which suit a cross-complaint had been filed by the Citizens Bank for the purpose of foreclosing its two mortgages, and that the superintendent had been substituted as a cross-complainant by order of the court under date of March 15, 1933, and that thereafter a judgment and decree had been rendered and entered against the Pompadour Mineral Springs Company and the Natural Lithia Springs Company, its successor in interest, jointly and severally, in the amount prayed for in the cross-complaint on the two causes of suit, including attorneys' fees and costs, and that the mortgages were ordered foreclosed and that the property which was described in the several mortgages, together with the tenements, hereditaments and appurtenances, were likewise to be sold in the manner provided by law.

It is further alleged that an execution was issued, based upon the judgment and decree, and that the sheriff sold the property, after properly advertising the same, to the plaintiff for an amount specified therein, and that thereafter two deeds were executed by the sheriff in favor of the plaintiff, there being no redemption, and that thereafter the Superintendent of Banks was authorized by an order entered in the liquidation proceedings, then pending in the circuit court, to enter into an option and sell the property to the City of Ashland, and by reason of the fact that it was impossible to procure a policy of title insurance, showing a merchantable and marketable title, because of various claims which had been advanced by the various defendants, it became necessary for the superintendent to

bring this proceeding for the benefit of the liquidation, the depositors and creditors of the bank. It is further alleged that defendants claimed some interest in the property, the exact nature of which was unknown, but it is alleged that none of them had any interest and that a decree should be entered to the effect that they had no interest therein. It is further alleged that a survey had been made of the property described in the two deeds and mortgages, in the mortgage foreclosure cross-complaint and in the decree, and that the property described in the complaint was the correct description of the property which was included in the mortgages, the mortgage foreclosure proceeding and the sale.

An order of default was entered against all the defendants, except R. B. Newbern, and also except Mr. Orth and Mr. and Mrs. Silver who disclaimed any interest in the property, and defendant Newbern in his answer and during the course of the trial virtually admitted all of the allegations of the amended complaint, with the exception that he claimed a portion of the property, upon which certain saline springs were located, was not subject to pre-emption by the pre-emption patentee to whom the patent was issued, and that the waters from these various springs had been appropriated by, and a water right certificate issued to, his predecessor in interest, and that the superintendent by these foreclosure proceedings had not obtained the right to these waters nor springs nor the land which was contiguous thereto. Mr. Newbern further claimed that he had filed upon these various springs under the Placer Mining Act and that they were subject to appropriation under the Federal Placer Mining Act.

It is alleged that the state water board of Oregon issued a water right certificate to the Pompadour

Mineral Springs Company November 15, 1922, and on that date also recorded it in the Record of Water Right Certificates, Vol. 5, page 3705. It is described in the amended answer of defendant Newbern to the amended complaint. The certificate is an exhibit in the record and was issued upon proof submitted to the board on November 15, 1922. September 18, 1915, the state engineer of Oregon issued his permit No. 2685 to Harry Silver and James S. Bailey, who were the claimants of the land in question at that time upon their application No. 4475. The application was received, the permit granted and the certificate of water right executed, delivered and recorded. At the time the application for the permit was filed there were situated upon the lands involved herein several mineral springs, one known as the Original Lithia Springs and one as the Pompadour Mineral Springs, and other springs of minor importance. Over approximately 20 acres of this land there were evidences upon the ground of other such mineral springs, namely, seepage of mineral waters, where the same passed through draws, and in which constantly bubbled the mineral gases which were released by exposure of the water to the air, and also which doubtless found their way through crevices in the formation, and escaped over this property. At this time a portion of the title to this land was owned by Silver and Bailey and they had acquired an option to purchase the portion of the outstanding title which they did not own, and were rightfully in possession of all of the premises which were affected by said appropriation. They filed their application to appropriate 0.22 of a second-foot of the waters of said springs and of the seepage on said land, which waters were tributary to Emigrant creek.

BEAN, C. J. It appears that on account of high water, and perhaps other causes, Emigrant creek has changed its course, so that it does not run as it formerly did close to the Original Lithia Springs. After making the application No. 4475 and the making of said permit No. 2685, and on December 22, 1915, said Silver and Bailey, for value, conveyed their rights under said application to the Pompadour Mineral Springs Company, the defendant herein. Before the issuance of said certificate of water right, Silver and Bailey acquired the full title to said lands and conveyed the same to said Pompadour Mineral Springs Company prior to the issuance of said water certificate, so that at the time said certificate was issued to the Pompadour Mineral Springs Company it was the sole owner, so far as the parties here are concerned, of the entire tract of land on which said springs and seepage flow, and held the title to the land and the certificate of water right at the time of the execution of the mortgages to which we have referred as having been foreclosed. After the issuance of said certificate and after the execution of said mortgages, the Pompadour Mineral Springs Company conveyed the certificate to the use of the waters of said springs to the defendant Natural Lithia Springs Company, which company assigned the certificate to one John S. Orth, as trustee.

It is claimed by defendant Newbern that the water flowing from these springs and the seepage water did not pass as appurtenant to the premises by virtue of the mortgages and the foreclosure thereof and the deeds executed by the sheriff to the plaintiff, or at all.

The plaintiff claimed in his second amended reply that inasmuch as in the foreclosure suit brought by Fauvre, in which the predecessor of the plaintiff was a cross-complainant and the Pompadour Mineral Springs

Company and the Natural Lithia Springs Company had set out the claim that Orth, the predecessor in interest of Newbern, was the owner of the water right certificate and in consequence the mortgage foreclosure could not affect his rights in and to the waters from these springs, and since the court had granted the cross-complainant's motion for judgment on the pleadings and had foreclosed the mortgages, and since the interest, if any, which Orth had obtained in and to these water rights had been obtained by assignment which had been made to Orth subsequent to the time that service had been made by the Pompadour Mineral Springs Company and the Natural Lithia Springs Company, through whom he claimed his interest and subsequent to the time they filed a demurrer therein, that this constituted res judicata as against the claim of Newbern, and that Newbern was estopped thereby from asserting any right under this water right certificate.

The judgment roll and proceedings in the foreclosure suit are in evidence in the present case.

Defendant Newbern alleges:

"That said patent was issued upon the application of said Andrew Taylor of date May 26, 1881, to acquire said lands under the Pre-emption Laws of the United States, Chapter 4 of Title 32 of the Revised Statutes, providing for the acquisition of lands under the pre-emption laws. That R. S. 2258 (5 Stat. 455), in force at the time of the said application to purchase said lands, and at the time of the issuance of the patent therefor, specifically provided that lands on which were situated known salines were not subject to the rights of pre-emption, and could not be acquired by pre-emption."

He further alleges that at the time of applying for the purchase of said lands said Andrew Taylor well knew that they contained said salines and said saline springs, but nevertheless made proof that said lands

were not saline and were nonmineral, and that at the time they patented said lands said saline springs were well known to be situated thereon.

Defendant Newbern calls attention to certain conveyances of the land in question, or a portion thereof, among which are the following: Andrew J. Taylor, patentee, and wife, executed a deed in 1891 to William R. Taylor which was recorded December 11, 1899, reserving one-half of the water right and a certain right of way. Wm. R. Taylor and wife executed a deed to Elizabeth J. Taylor, filed for record November 5, 1895, reserving one-half of the water right. Elizabeth J. Taylor, a widow, executed a deed to Wm. R. Taylor, filed for record January 8, 1904, reserving the right of Andrew J. Taylor and wife to one-half the water right. Andrew J. Taylor and wife executed a deed to Wm. R. Taylor, which was filed for record July 31, 1907, conveying the land and also the mineral springs and water right thereon. The heirs of John B. Taylor, together with Elizabeth J. Taylor, executed a deed to Wm. R. Taylor, which was filed for record February 19, 1908, embracing a part of the land with the mineral springs.

The evidence indicates that, at the time the preemption patent was issued to Taylor in 1884, the springs were considered in that neighborhood to have but little or no commercial value, although prior and subsequent to that time cattle and sheep had been and were accustomed to come to the springs for the purpose of using the salt which could be obtained therefrom, and the people living in that neighborhood occasionally drank the water and bottled the same and took it to their homes for drinking purposes; that the land near the springs had been cultivated for several years, but no commercial development of the springs had taken place until approximately 1910, and after that the largest

springs which were flowing on the property had been developed by Silver and Bailey, and their successors, and the Pompadour Mineral Springs Company and the Natural Lithia Springs Company so as to obtain whatever value there might be in the waters for medicinal and mineral purposes.

Emigrant creek, which formerly ran close to and over the Original Lithia Springs, on account of high water changed its course and ran some distance north of where it formerly flowed. There is an old draw leading from the Original Lithia Springs, to where Emigrant creek formerly ran, and connecting with Emigrant creek, and another draw leading from the Original Lithia Springs past the Pompadour Mineral Springs to Emigrant creek below the City Lithia Springs at Ashland. At times the water from the Original Lithia Springs, which is the larger, seeps or runs down the draw about 1,500 feet. There are several so-called salt springs, or saline springs, in that vicinity and also at other places on the cattle range. As alleged by the defendant Newbern the mineral waters flowing from the Old Lithia Springs contained gases which bubbled forth on the surface of the soil, which were visible. Said springs contained salt, sodium, chloride, magnesium, lithium, potassium and other salines, commonly known as and called saline springs, and deposited said minerals upon the surface of the land. It was necessary to dig these two larger springs to a depth of several feet so as to utilize the flow therefrom. At the present time the springs are in disuse.

The bank bid in the property for the full amount of its judgment in the sum of $11,426. The certificate issued to Silver and Bailey, which was subsequently assigned to Pompadour Mineral Springs Company, and the permit issued to Pompadour Mineral Springs

Company provided that the use to which the water was to be applied was "for domestic purposes and the distribution and sale as table water and for medicinal purposes, and that the water was to be bottled in houses erected at the springs and to be used for domestic purposes on the ground". The evidence showed that the water could not be used for irrigation purposes, and that there was no well-defined watercourse leading from the springs.

■ The appellant objected to the introduction of the sheriff's deed issued pursuant to the mortgage foreclosure, and contends that the date of one of the mortgages is incorrect, being April 1, 1920, the date of the Fauvre mortgage instead of the bank's mortgage, and claims such a proceeding is an error, and also contends that the order of confirmation was entered prematurely. The sale under the decree of the foreclosure of the mortgages having been confirmed by the court, any irregularity occurring in the issuance of execution, notice of sale, or premature confirmation, was cured and cannot be used as a basis of a collateral attack which the present proceeding is deemed to be: § 3-409, subd. 4, Oregon Code 1930; *Bobell v. Wagenaar*, 106 Or. 232 (210 P. 711).

Under section 3-409, subd. 4, it is provided: "An order confirming a sale shall be a conclusive determination of the regularity of the proceedings concerning such sale, as to all persons in any other action, suit or proceeding whatever; * * *." *Bobell v. Wagenaar*, supra, forecloses the question in regard to an attack upon these proceedings, since it was there held by Mr. Justice RAND, pages 239 and 240 of the report, that inasmuch as the court had jurisdiction of the parties and subject matter of the controversy, such an order, even though made prematurely, is not void and cannot

be attacked collaterally but is binding upon the parties until reversed or annulled, however erroneous it may have been.

■ The appellant questions the validity of the patent issued for the land for the reason that it contained minerals and that the land office had no jurisdiction to grant such salines under the application. The pre-emption patent issued to Andrew Taylor and the title that the plaintiff obtained as his successor in interest is not subject to collateral attack upon the part of Newbern, and Newbern's attempt to make a placer mining location upon the land on which these springs are located is ineffective.

In *Reeves v. Oregon Exploration Co.*, 127 Or. 686 (273 P. 389), (cert. denied 279 U. S. 862, 73 L. Ed. 1001, 49 S. Ct. 479), in an opinion by Mr. Justice RAND, it was held where patents are issued under the Timber and Stone Act or under the Homestead, Pre-emption, Desert Land or Townsite Laws, the title purported to be conveyed is a fee simple title, and if the land contains minerals which were known to exist when the patent was issued, the title conveyed by patent is conclusive on all third parties whose right did not attach before the patent issued, and in such case only the government or a party whose right had attached prior to the issuance of a patent can question the title conveyed by patent as regards the right to the minerals. The defendant Newbern has no claim or right that attached to the land before the patent was issued and is not entitled to question the title conveyed by the pre-emption patent. See *Hoofnagle v. Anderson*, 7 Wheat. 212 (5 L. Ed. 437); *Burke v. Southern Pacific R. R. Co.*, 234 U. S. 669 (58 L. Ed. 1527, 34 S. Ct. 907); *Davis's Administrator v. Weibbold*, 139 U. S. 507 (35 L. Ed. 238, 11 S. Ct. 628).

In *Burke v. Southern Pacific R. R. Co.,* supra, Mr. Justice Vandevanter said:

"The exclusion of mineral lands is not confined to railroad land grants, but appears in the homestead, desert-land, timber and stone, and other public-land laws, and the settled course of decision in respect to all of them has been that the character of the land is a question for the Land Department, the same as are the qualifications of the applicant and his performance of the acts upon which the right to receive the title depends, and that when a patent issues it is to be taken, upon collateral attack, as affording conclusive evidence of the nonmineral character of the land and of the regularity of the acts and proceedings resulting in its issue, and, upon a direct attack, as affording such presumptive evidence thereof as to require plain and convincing proof to overcome it." Citing *St. Louis Smelting Co. v. Kemp,* 104 U. S. 636 (26 L. Ed. 875), and other cases.

It is said by Mr. Chief Justice Marshall in *Hoofnagle v. Anderson,* supra, quoted in *Reeves v. Oregon Exploration Co.,* supra:

"It is not doubted, that a patent appropriates land. Any defects in the preliminary steps, which are required by law, are cured by the patent. It is a title from its date, and has always been held conclusive against all those whose rights did not commence previous to its emanation.  *  *  *  If the patent has been issued irregularly, the government may provide means for repealing it; but no individual has a right to annul it, to consider the land as still vacant, and to appropriate it to himself."

As to the right to the water of the springs and the seepage water, section 47-1401, Oregon Code 1930, provides as follows:

"Ditches for waste, spring, or seepage water.  All ditches now constructed, or hereafter to be constructed, for the purpose of utilizing the waste, spring, or seepage waters of the state, shall be governed by the same laws

relating to priority of right as those ditches constructed for the purpose of utilizing the waters of running streams; provided, that the person upon whose lands the seepage or spring waters first arise, shall have the right to the use of such waters."

In *Henrici v. Paulson,* 134 Or. 222 (293 P. 424), we said:

"The spring and waters thereof, involved herein, are the exclusive property of defendants. The water of the spring is not subject to appropriation by the plaintiffs; therefore, there is no necessity for the right of way sought to be condemned." (Citing numerous cases). See also *Klamath Development Co. v. Lewis,* 136 Or. 445 (299 P. 705); *Morrison v. Officer,* 48 Or. 569 (87 P. 896).

As indicated, there was a series of springs situated on the land in question, both at the time of the patenting of the land and also at the time of the application for and the issuance of the water permit and water right certificate. One of these springs which had been called in the record the "Original Lithia Springs" was originally right in the bed of Emigrant creek. Such springs, it is said, are usually in the stream bed and along the water courses. This spring was frequently, during high water in early days, covered over by the waters of the stream. At such times, and when the water flow became normal, before Emigrant creek changed its course materially, the springs drained into Emigrant creek. In the early days a flood in Emigrant creek changed the course of the stream near the Original Lithia Spring. After that the drainage from the spring for a short distance was practically seepage down the old creek bed which became what is designated on the map as "Draw 1." There was an ancient channel of the creek which has been designated on the map as "Draw 2" in which the Pompadour Mineral Springs

was developed. In this draw there was always seepage from these mineral springs and at times when there was surplus water probably some of the water from the spring found its way into Emigrant creek.

■ The pivotal question in this case is, what passed by virtue of the mortgages in question. The first mortgage which was foreclosed and under which the plaintiff claims bears date of October 25, 1918, and recites that it is executed under and by authority of the board of directors of the Pompadour Mineral Springs Company, and provides that the mortgagor

"does hereby grant, bargain, sell and convey unto John Braun of Portland, Oregon, the following described real property, * * * (here described).

"Together with the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and also all the estate, right, title and interest, property, possession, claim and demand whatsoever of said party of the first part, all in and to the same, the reversion and reversions, remainder and remainders, rents, issues and profits thereof."

And in the body of the mortgage it is provided that upon default being made under the terms thereof the second party and his assigns is empowered to sell the premises "with all and every of the appurtenances of any part thereof in the manner prescribed by law."

The second mortgage bears date of March 8, 1923, whereby the Pompadour Mineral Springs Company did

"grant, bargain, sell and convey unto the said party of the second part * * * all that certain tract of real estate * * *.

"Together with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining.

"To have and to hold unto the said party of the second part, his successors and assigns, forever."

It is provided in said mortgage that in case of default the second party, or assigns, was empowered to sell the premises "with all and every of the appurtenances or any part thereof in the manner prescribed by law." Both of these mortgages were duly recorded; both were regularly foreclosed by the decree. Execution was issued on the decree and the property was duly sold by the sheriff and purchased by the plaintiff and deeds therefor executed to the plaintiff.

As stated, the Pompadour Mineral Springs Company owned the land in question at the time of the execution of the mortgages.

Under section 47-1401, Oregon Code 1930, which we deem declaratory of the law, the springs, and seepage water therefrom and from the land, were a part and parcel of the land itself, and the right, title and interest therein passed by virtue of the mortgage and foreclosure proceedings and sale upon execution issued upon the decree and the sheriff's deed executed pursuant thereto, in the same manner as title to timber standing on the land would have passed.

The mortgages covered and conveyed, by way of mortgage, the land including the right to take the water from the mineral springs and the seepage waters. Therefore the Pompadour Mineral Springs Company or the Lithia Mineral Springs Company could not, either by assigning the water right certificate or making a deed to the water right, pass any title to the right to take the waters which would be superior to the mortgage.

██ It would be physically and legally impossible to separate the seepage water from this land, and the right to the waters of the spring were not legally separated

from the land itself by virtue of the certificate of the state engineer. As we view it, the filing upon the water of the springs before the state engineer, and obtaining a permit and certificate, would have only the effect of protecting the right of the owner of the land to the water in case there should be an increase of the flow from the springs so as to pass from the land in question to other lands. In such case it is possible that it would be a protection to the owner of the lands and springs after the water had escaped from the land. The owner of the land making an application for and obtaining a permit and certificate of water right would not separate the water or the right thereto from the land. It is claimed on the part of the defendant that inasmuch as the water right certificate was recorded separately from the deeds it amounted to severing the appropriation of the water from the land. With this contention we are unable to agree. It is a well-known fact that it is the practice to record water rights, in the adjudication of the different streams of the state, in a record separate from that in which deeds to the land, to which the water rights are appurtenant, are recorded.

If Orth, the trustee, had obtained any interest in the water rights by virtue of the assignment of said certificate, it was obtained subsequent to the institution of the suit to foreclose, and said water rights were subject to said mortgages and foreclosed and transferred by means of the foreclosure suit and the sale upon execution issued upon the decree and the deeds of the sheriff, executed pursuant to the decree.

■ It was perfectly competent for the legislature of the state of Oregon, in regulating water rights in this state, in order to avoid confusion, by virtue of section 47-1401, to provide that ''the person upon whose land

the seepage or spring waters first arise shall have the right to the use of such waters."

It is also shown by the record by means of a photograph that there are two old buildings on the land which were said to have been constructed over the springs. While they are in poor repair and indicate that they have been constructed for some time, yet we think the buildings, as well as the springs, were conveyed by the mortgages and sheriff's deeds referred to. In the absence of any reservation of a portion of the soil, the reservation of any buildings or water rights, we feel certain that the water rights in question passed by virtue of the mortgages and foreclosure and sale and deeds mentioned.

The water from these springs and the seepage water on the land do not form a running stream or natural water course, but are more in the nature of surface water. We read in 67 C. J. 862, § 286:

"Surface waters are those which fall on the land from the skies or arise in springs, and diffuse themselves over the surface of the ground, following no defined course or channel, and not gathering into or forming any more definite body of water than a mere bog or marsh, and are lost by being diffused over the ground through percolation, evaporation, or natural drainage." See also *Price v. Oregon R. R. Co.* 47 Or. 350, 358 (83 P. 843).

■ It might be said that the springs and water in question are similar to appurtenances, but we do not deem them as appurtenant to the land, but rather a part thereof. 2 Kinney on Irrigation and Water Rights, 1786, § 1005 (2d Ed.), states:

"Appurtenances are things belonging to another thing as principal, and which pass as incident to the principal thing. It is that which belongs to another

thing, but which did not belong to it immemorially. Water rights may or may not be appurtenances to land.''

In 1 Weil on Water Rights (3d Ed.), 587, § 551, we read:

''The first question, whether the water right is an appurtenance, depends on whether it is an incident, necessary to the enjoyment of the land. The water right is not necessarily appurtenant to or parcel of any land; and whether it is an appurtenance or parcel is a question of fact resting chiefly upon whether it was used specially for the benefit of the land in question. (Citing among other cases *Nevada Ditch Co. v. Bennett,* 30 Or. 59, 60 Am. St. Rep. 777, 45 P. 472). When used for irrigation, there will seldom be doubt of such necessity. A water right or ditch right is appurtenant only to such lands of a large tract as had been actually irrigated from it.''

▌ The evidence shows that the waters in question were not used for irrigation of the land nor were said waters applied to other beneficial use upon the land. It does not follow, however, that these waters became or were severed from the land by the permit and certificate of the state engineer. Therefore we gather but little assistance from the rules governing irrigation water. The water code of the state of Oregon, sections 47-101, et seq. Oregon Code 1930, provides for the appropriation of the public waters of the state. The waters with which we are concerned are not public waters, and no one has a right to file for the same excepting the owner of the land, a matter to which we have already referred.

▌ A mortgage of land, with the appurtenances· covers both the incorporeal hereditaments annexed to the realty and also such physical property, or rights to

or in connection with it as are used with and for the benefit of the land, and are reasonably necessary for the beneficial and proper enjoyment thereof, such as water rights: 41 C. J. 482, § 400.

Whether the right to the water of these springs is deemed an appurtenance or not, the right thereto passed by virtue of the mortgages in question, the foreclosure decree, the sale and deeds of the sheriff: § 47-1401, Oregon Code 1930.

■ There was a reservation in the mortgages and sheriff's deeds reserving a right of way across said lots 8 and 9 as a private road for the use of the owners of lots 5, 6, 8 and 9, or any portion thereof, to be maintained as a private roadway for the owners of said land and their heirs and assigns. This practically has no connection with the springs upon the ground and in order for the right to the water of these springs to be conveyed or reserved it would be necessary to convey or reserve a portion of the land. It is not contended that any portion of the land was excepted or reserved from the mortgages in question.

The trial court decreed that the plaintiff is the owner in fee simple free and clear from any and all right, title, estate, lien and interest that said above named defendants and each, every and all of them, and anyone claiming by, through or under them, may have or claim to have in and to those certain premises lying and being situate in Jackson county, Oregon, and more particularly described by metes and bounds, with the description of the real property involved therein, containing 56.75 acres, more or less,

''Together with all and singular the tenements, hereditaments and appurtenances, including water rights, ditch rights and mineral rights, thereunto belonging or in anywise appertaining.''

The decree further provides that plaintiff's title in fee simple be quieted as against said defendants, and each, every and all of them, and every one claiming by, through or under them, and that whatever right, title, estate, lien or interest that said defendants may claim to have in and to said premises is null and void and of no force or effect, except as to said right of way in the decree described.

We affirm the decree of the lower court.