Argued January 6, reversed and remanded February 25, 1977

WIMMER et al, *Respondents/Cross-Appellants,*
*v.*
COMPTON, *Appellant/Cross-Respondent.*
(No. 74-1396-E-2, SC 24327)
560 P2d 626

Walter D. Nunley, Medford, argued the cause and filed a brief for appellant/cross-respondent.

Thomas D. Melum, Medford, argued the cause for respondents/cross-appellants. With him on the brief were W. V. Deatherage, and Frohnmayer and Deatherage, Medford.

Before Denecke, Chief Justice, and Tongue, Linde, and Bradshaw, Justices.

BRADSHAW, J. (Pro Tempore).

**BRADSHAW, J.,** Pro Tempore.

This is a suit seeking to enjoin defendant from continuing to maintain a land fill placed on his real property which is alleged to have blocked the usual course of runoff of ordinary flood waters which had annually followed a natural course across defendant's land.

It is claimed that such blockage causes the flood waters to go upon and flood plaintiffs' real property. Plaintiffs seek, in addition to injunctive relief, to recover damages caused by the flooding of their property.

Defendant admits that during 1969 he raised the elevation of at least a portion of his property by depositing fill dirt thereon, but he denies all other claims of plaintiffs. Defendant's affirmative answer and defense allege that the flooding of plaintiffs' property was caused by other conditions.

The trial court by decree found

> "that during 1969 defendant had allowed dirt to be placed on his property and said dirt has changed the elevation thereof to cause surface waters and ordinary flood waters to be cast upon plaintiff's real property."

The trial court denied damages to plaintiffs, finding that damages claimed were speculative. The decree required defendant to return his property to the same condition as it existed prior to the time the fill dirt was placed on said property during the year 1969.

Defendant appeals from the trial court's decree, claiming as error that there was no substantial evidence upon which it could be found that the filling of defendant's property was the cause of flooding on plaintiffs' property. Plaintiffs cross-appeal, assigning as error the trial court's finding that damage to their property was speculative.

The relative location of the parties' properties, of the adjoining properties, streets, ditches, waterways,

and culverts, and the general topography of the area pertinent to this case can best be illustrated by the following sketch. This sketch is not to scale and does not purport to be accurate as to distances except those actually shown on the map, as proven by the evidence.

Plaintiffs' property was acquired in 1944, and plaintiff Lavetus M. Wimmer has lived in the home (H1) since that time. This home is approximately 75

years old. Plaintiff Max H. Wimmer is the son of Lavetus M. Wimmer. He was 14 years of age when the family moved onto the property where he lived until he went away and "got married." He has been back to the property on a regular basis during his adult life. He is now 45 years of age. The home (H2) was built on the property in 1961.

Defendant acquired the property adjoining plaintiffs' on the east in 1967. In 1967 he placed some fill dirt on the back, or south portion, of his property. Later, in 1969, additional fill was placed on defendant's property north of the original fill. In 1973 additional dirt material was dumped in a pile on the northerly portion of defendant's property by a construction contractor.

The properties of both parties, together with areas extending for some distance south and north, are all contained in a single runoff or drainage system of water from various sources. This runoff or drainage flows naturally from south to north. The waters in this system consist of Griffin Creek drainage to the south of Sunset Avenue, collections of surface waters in natural ditches and artificial or man-made ditches, and an irrigation ditch south of Sunset Avenue. This general drainage system flows through an open ditch commencing on the north side of Sunset Avenue and running north along Courtright's east boundary and the boundary line between plaintiffs' and defendant's properties to West Second Street. This ditch normally receives waters from a 36-inch culvert and several 12-inch culverts running under Sunset Avenue. Two 24-inch culverts run under West Second Street at the northern terminus of this ditch and, in normal times, carry the water from the ditch north under West Second Street. The land north of West Second Street was owned by Mr. Wimmer's aunt and is characterized as a "tule patch" with a thick growth of cattails. A ditch or waterway running half way north to McAndrews Street through this area was kept clear by Mr. Wimmer until he left home. From that point, half way

between East Second Street and McAndrews Street, the land flattens out, becoming low, and collects water. The system then proceeds north under McAndrews Street through the two culverts; one, 36 inches, and one, 24 inches. The bottom of each culvert lies approximately two feet above the ground level, which allows considerable collection of flood water in the area between West Second Street and McAndrews Street. The land between West Second Street and McAndrews Street drops in elevation approximately two feet. The distance between these streets is undisclosed by the evidence. The land areas to the west, east and south of plaintiffs' and defendant's properties are generally at a higher elevation. Almost annually, for many years, there have been flooding problems throughout the general area caused by excessive rains and runoff.

Plaintiffs contend that for many years prior to 1967 a natural and defined channel or drainage of ordinary flood waters overflooded the ditch adjacent to defendant's west boundary, crossed over defendant's land and West Second Street and thereafter rejoined the main drainage system south of McAndrews Street. They further contend that by filling his property, defendant has cut off or curtailed such natural, ordinary flood course and has caused the ordinary flood waters to go upon plaintiffs' property.

■ Where, in times of flood, any part of a stream or water course which becomes separated from the main body flows an ordinary and consistent course and returns to the natural channel as it recedes, it is, properly speaking, a natural water course. Such flooding must be ordinary as opposed to extraordinary flooding. Ordinary flooding is that which occurs annually or at certain seasons or other regular intervals, which is not of unprecedented magnitude, and which is generally regarded as ordinary. *Wellman et ux v. Kelley and Harrison,* 197 Or 553, 252 P2d 816 (1953); *Schweiger et ux v. Solbeck et ux,* 191 Or 454, 230 P2d 195, 29 ALR2d 435 (1951); *Price v. Oregon Railroad Co.,* 47 Or 350, 83 P 843 (1906).

[ 318 ]

In *Wellman, supra,* an upstream owner, through whose land coursed a long established and well defined ordinary flood water course, was successful in prohibiting an adjacent downstream owner from obstructing that ordinary flood water course to the detriment of the upstream owner. This court quoted with approval from 56 Am Jur 510, Waters § 18:

"* * * Without the consent of the other proprietors who may be affected by his operations, an upper proprietor has no right unreasonably to interrupt or retard *the natural flow of water,* to the injury of lower owners, nor has a lower proprietor the right to throw the water back upon the proprietors above * * *." (Emphasis supplied by *Wellman* court.) 197 Or at 565-66.

Accord, 78 Am Jur2d 455-56, Waters § 11.

■ We find no distinction in applying this principle as between upper and lower owners as compared to adjacent owners on opposite sides of the flood water course.

■ Starting in 1944 and up to the time of the filling of defendant's property, the winter high runoff of ordinary flooding consistently had, to some degree, entered upon defendant's property along the east side of the ditch and thereafter coursed across both his property and West Second Street, eventually rejoining the normal drainage course north of West Second Street. Defendant's property on the north adjacent to West Second Street was approximately level with the surface of West Second Street in 1944. The greater weight of the evidence indicates that at least a portion of defendant's property on the westerly side was of a slightly lower elevation than plaintiffs' property generally. However, this difference was not in excess of 6 to 8 inches. In 1944 the area of defendant's property which this ordinary flood water coursed was generally westerly of a line commencing near the southwest corner of defendant's property and ending at a point on defendant's north boundary near the northeast corner thereof. Mr. Wimmer testified that the water in this area was 6 to 8 inches deep in times of flood. He also

[ 319 ]

stated that this condition was about the same until 1964. However, in 1944 the ditch area was spanned on West Second Street by a small wooden bridge. This bridge was replaced with the two 24-inch culverts by a Mr. Thrasher in 1957 or 1958. These culverts under West Second Street were inadequate to carry off the winter flood waters and through the years have accumulated a considerable deposit of silt, thus reducing their capacity considerably. Mr. Thrasher, when installing the culverts and improving West Second Street, caused the level of the surface of West Second Street to be raised 5 or 6 inches. Additional work on West Second Street subsequent to 1964 has raised the surface level 8 to 10 inches between the culvert area and the Medford city limits to the east.

Mr. Courtright, after a flooding in 1964, placed a dike 1 to 2 feet high on the south, east, and north sides of his property in an effort to prevent water running down north across his property.

In 1973 plaintiffs cleared out a ditch running along their south boundary which emptied into the north-south ditch between plaintiffs' and defendant's properties.

The evidence is conflicting in relation to water flooding onto plaintiffs' property prior to 1967. Both plaintiffs claim that it did not. Prior to his retirement, Mr. Bingham, plaintiffs' witness, had been employed by the Jackson County Road Department for 41 years—the last 21 of which he was maintenance foreman. In response to cross-examination as to how long a period of time there had been a flooding problem on the Wimmer property or on the low lying property in the area, he stated that there had been flooding there all during the time he had worked for the county. Mr. Courtright, when shown plaintiffs' photographic exhibits portraying conditions of flooding in January 1974, responded that he had seen those conditions numerous times in the past. He stated further that every winter water had come across

Sunset Avenue, down across his property, and right on through, and that "everytime [he] got it, Wimmer got it."

Witnesses for both parties who had observed the area in recent years expressed opinions that the growth of blackberry vines along the ditch and debris cast therein by children caused some impediment to the flow of water in the ditch.

The main thrust of plaintiffs' evidence centered on conditions of flooding which occurred in January 1974. Mrs. Wimmer did testify that similar flooding conditions had occurred in prior years but subsequent to defendant's placing the fill on his property. Mrs. Wimmer's testimony consisted principally of a description of conditions in the area in January 1974 and was given with reference to many photographs taken by her at that time. The total import of her testimony was that the waters of the north-south ditch in times of flooding were backed up south of West Second Street toward her southeast corner to the extent that the water came around to the rear, or south portion, of her property and then down across her property. A number of these photographs show considerable collection of water on the southwest portion of plaintiffs' property and around both houses. This water appears to be in the process of running off north across West Second Street at a low point opposite the two houses. In reference to these photographs, Mrs. Wimmer stated that it was "just general runoff" and showed "how it comes down onto my property." The photographs indicate very little water on plaintiffs' property immediately west of the ditch.

It is quite obvious that the photographs and Mrs. Wimmer's testimony in relation thereto must refer to a condition after the flood waters had reached their peak and had receded to some extent. Photographs which Mrs. Wimmer indicated portrayed backing up of water in the ditch show, quite to the contrary, a strong current flowing north in the ditch.

Plaintiffs produced no evidence of the conditions at the peak of the flooding or how the flood waters came onto their property other than the testimony of Mrs. Wimmer referred to above. The record is entirely void of direct evidence of the volume, rate of flow, or height of the water at flood stage at the time it is claimed that the water entered upon plaintiffs' property.

Defendant had not been familiar with the area prior to acquiring the property in 1967. Prior to 1974 he had not been present to observe any flooding conditions. He described the conditions as they were observed by him in January 1974 and indicated that there was water on his property in an area on the northwest portion thereof, which water was also covering West Second Street up to a point midway in his north boundary. He indicated the water covered West Second Street from that point 100 to 150 feet west of the culvert area but that it was shallower at a point over the culvert area. He further stated that there "just wasn't enough capacity" to take the water across and that the area between West Second Street and McAndrews Street was flooded to the extent it would not carry the water off fast enough.

Plaintiffs' witness Mr. Blanton, a consulting engineer, indicated that the low point on West Second Street was basically cut off by the soils that were placed on defendant's property. However, a basis for this conclusion was the elevation of West Second Street as shown on a City of Medford planimetric map drawn up in 1958, which he had consulted.

Defendant's witness Mr. Shaw, also a consulting engineer, made a topographic survey of the area in question in April of 1975. The evidence indicates no change in the topography between January 1974 and that date. The results of this survey were introduced as an exhibit indicating thereon elevations of areas involved in this case. These elevations were obtained by actual measurement at the sites. Without reference to other matters contained on the survey exhibits, and

disregarding assumptions and opinions made by the witness, consideration of the elevation figures thereon is important. These elevations are indicated in feet and hundredths of feet over 1300 feet above sea level. For example, the figure 81.26 indicates an elevation of 1381.26 feet above sea level. Elevations of the surface of West Second Street and at points on the parties' properties which are pertinent to this decision are indicated on the sketch made part of this opinion.

The lowest elevation of the surface of West Second Street east of the culvert location is at a point approximately one-fourth of the distance between the culvert location and defendant's east boundary and is designated by the figure 81.26. This low point is 3¾ inches below the lowest elevation on plaintiffs' property immediately west of the ditch. This lowest point on plaintiffs' property is near the northeast corner thereof and is designated by the figure 81.57. The elevation of plaintiffs' property immediately west of the ditch increases proceeding south from this point to elevations of 81.67, 82.02, 82.01 and 82.11. There is a considerable area on defendant's property east of the ditch and proceeding north to West Second Street with elevations less than 81.57. The elevation line of 81.57 on defendant's property turns northeasterly prior to reaching the south edge of West Second Street and crosses West Second Street at a point approximately midway between the culvert area and defendant's east boundary. This indicates a considerable avenue of escape for flood waters over defendant's property and West Second Street before the water level reaches the lowest elevation of 81.57 at plaintiffs' northeast corner. The elevation of the surface of West Second Street at a point opposite plaintiffs' northeast corner is 81.44. The elevation of the surface of West Second Street then descends to 81.12 opposite the westerly portion of house H1 and rises again to an elevation of 81.26 at a point opposite the easterly portion of house H2.

It is apparent that many events and changes in

conditions occurred in this drainage system over the years subsequent to 1944, all of which have contributed in varying degrees to the causation of the flooding of plaintiffs' property. The substitution of culverts for a bridge and subsequent deposits of silt runoff have prevented adequate flow of flood waters and have caused a damming or backing up of the waters. The diking and ditching by neighbors to the south and the clearing of plaintiffs' lateral drainage ditch all contributed to a greater collection and concentration of drainage waters in the north-south ditch. The growth of brush and blackberry vines and accumulation of other debris in the ditch have curtailed to some degree the flow of water therein. The flooding of the area north of Sunset Avenue impedes the runoff of flood waters and is a factor in the backing up of escaping waters over and under West Second Street.

Lastly, and most dramatically, the raising of the level of the surface of West Second Street between the area of the culverts and defendant's east boundary has eliminated a considerable area where flood water could run over East Second Street, and, more importantly, has caused the flood waters to reach a much higher level before they can escape over West Second Street. Therefore, it follows that this raising of the level of West Second Street has in and of itself increased the height of backed-up flood waters some 8 to 10 inches or 13 to 15 inches, depending upon the interpretation of the evidence, and, in addition, has shifted the escapement area toward the west. Had defendant never placed fill on his property, the effect of raising the level of West Second Street would have been the same.

Any filling of defendant's property which would obstruct flood water from escaping and flowing over West Second Street at the present increased level would, of course, constitute an obstruction of a natural flood water course; and, if such obstruction was the cause of water flooding plaintiffs' property, injunctive relief against defendant would be appropriate. How-

ever, whatever backup of flood waters that entered upon plaintiffs' property was caused by conditions other than defendant's filling his property and probably was caused primarily by the raising in elevation of West Second Street east of the culvert area. The evidence creates grave doubt in the mind of this court that the defendant's filling of his property was such as to obstruct flood water runoff over West Second Street at its present elevation. Plaintiffs did not meet the required burden of proof in establishing that the filling of defendant's property was the cause of flooding of plaintiffs' property.

In light of this decision, it becomes unnecessary for us to decide plaintiffs' assignment of error on cross-appeal.

The decree of the trial court is reversed, and the case is remanded for entry of a decree in conformance with this opinion.