Argued December 1, 1978; resubmitted in banc
May 1, 1979, affirmed May 7, reconsideration denied June 5

SENN et ux, *Respondents,*

*v.*

BUNICK, *Appellants.*

(No. 36896, CA 10243)

594 P2d 837

[34]

Frank M. Ierulli, Portland, argued the cause and filed the briefs for appellants.

Frank L. Whitaker, Portland, argued the cause for respondents. With him on the brief was Whitaker & Whitaker, P.C., Portland.

BUTTLER, J.

**BUTTLER, J.**

In this trespass action plaintiffs had a judgment on a jury verdict for $10,000 general, $5,000 special and $40,000 punitive damages. Defendants appeal. Plaintiffs having had a jury verdict, we resolve all conflicts in their favor and give them the benefit of the favorable evidence as well as all inferences reasonably to be drawn from that evidence. *Hansen v. Bussman,* 274 Or 757, 549 P2d 1265 (1976).

Plaintiffs acquired their 10-acre tract in the late 1940's. It is heavily wooded in part and somewhat hilly. They make their home there and also have used the property to pasture small numbers of livestock. For several hundred feet along its south side it shares a boundary with the tract owned by the defendants, who began to develop their property as a residential subdivision in 1973. Near the northeasterly corner of defendants' tract some feet south of the boundary line there enters a small stream, which prior to the defendants' development activity split into two courses about 50 feet west and south of plaintiffs' easterly property line. The southerly course flowed west and generally parallel to the boundary for a distance of about 250 feet, where it turned north and then entered plaintiffs' property. The northerly course flowed west by north, crossed the boundary about 150 feet from the division point and rejoined the southerly course at a point on plaintiffs' land. From there the stream meandered, mostly on plaintiffs' land, in a westerly by north direction. Between the two courses and on either side the entire swale, for varying widths, was a flood plain which was commonly inundated during periods of heavy runoff. Part of the plain was meadowland on plaintiffs' property, which was used primarily for pasturing livestock.

In 1949 plaintiffs constructed a fence along a line that the prior owner told them was the surveyed

[35]

boundary. The fence did not lie exactly on the boundary line at all points, running inside plaintiffs' property at some places and as much as a foot on defendants' property at other places. In the 1960's, the predecessor of the Unified Sewer Agency acquired a 15-foot wide sewer easement running west by north across the northeasterly corner of defendants' land and through plaintiffs' tract. On plaintiffs' property all but the most easterly part of the easement was north of the stream. A few feet north of the boundary and north of the north water course, the agency constructed a manhole on the sewer line, but did not affect the creek's flow or location.

When defendants laid out their subdivision, they decided that certain of the lots whose slope contours ran toward the swale should be made more level. They did not survey the property line. The earth-moving operations resulted in three of the conditions on which this action was based. First, dirt and debris were pushed on, through and over the fence, destroying it at several places. Second, quantities of dirt were spread onto plaintiffs' property, as much as 25 feet in some places, as deep as two or more feet and at widths of 30 feet or more. Third, the south course of the stream was blocked permanently. In addition, when defendants entered on the easement to make a sewer hookup, they built a coffer dam around the manhole, using dirt taken from plaintiffs' land outside the easement. The building of the coffer dam also caused a diversion of the north watercourse onto plaintiffs' land outside the easement; the original diversion was temporary, but the disturbance of the stream bed has caused subsequent intermittent flowing of water north of the manhole through a channel that did not previously exist. Finally, the drainage from houses built on defendants' subdivision was conducted in such a way as to increase the flow of surface water at least temporarily onto and over plaintiffs' land.

Plaintiffs complained about the destruction of the fence and the movement of dirt and debris onto their

[36]

land. Defendants eventually removed most of the dirt and debris but did not fully restore the property to its previous condition. They made several attempts to rebuild a fence before plaintiffs finally accepted some 700 feet of new fence along the line of the old one. The coffer dam was eventually removed or eroded, but the area was not fully restored. The diversion of the creek through the closing of the south course was permanent and resulted in increased depth of flooding, increased normal water flow, the cutting of new watercourses in the flood plain, some erosion and the deposit of detritus—all on plaintiffs' land.

In a single count cause of action, plaintiffs claimed general damages and that the acts complained of were done wilfully, wantonly, maliciously, intentionally and with knowledge of their probable harmful consequences, thus giving rise to liability for punitive damages. Special damages were asked for the expense of having to find other pasture while the fence was down, for the cost of clearing the pasturage of growth which happened while there was no grazing, and for "mental anguish and suffering, frustration and humiliation." The jury reached the verdict described above.

Of defendants' several assignments of error, most may be disposed of summarily. The trial court properly denied a motion to strike from the case any claim with respect to the fence. There was evidence from which the jury could find that the fence was on the plaintiffs' property and was destroyed by defendants. That defendants eventually reconstructed a fence to plaintiffs' satisfaction merely went to the question of mitigation of damages for the trespass. Similarly, the trial court properly refused to strike the claim for trespass arising out of the construction of the coffer dam. There was evidence from which the jury could fairly conclude that the stream was at least temporarily diverted over plaintiffs' land where it had not flowed before, and that dirt to construct the dam was taken from plaintiffs' land. Defendants' reliance on

*Hudson v. Peavey Oil Company,* 279 Or 3, 566 P2d 175 (1977), is misplaced. Unlike the situation there, in this case there was sufficient evidence from which the jury could find that defendants knew or should have known what they were doing, and they knew or should have known of potential effects on plaintiffs. Finally, in the summary category, the trial court properly refused to relieve defendants of liability for the earth-moving activities, because they were clearly trespassory insofar as they resulted in the moving of dirt from defendants' land to plaintiffs'.

■■ Defendants assert that they could not be liable for the water flow changes caused by filling their land, even if those changes were as plaintiffs claimed. Defendants state in their brief:

> "* * * The Defendants merely reclaimed that portion of their land subject to *** flooding and forced the water into the long-established natural channels that existed. * * *"

The facts and the law render that statement curious at best, and preposterous at worst. Defendants' own evidence, including two aerial photographs, show that part of the historical watercourse was permanently closed by the movement of earth, and there was other evidence that an increased amount and velocity of ordinary flood and surface water was caused to flow on and across plaintiffs' land. That was actionable (*Wellman et ux v. Kelley and Harrison,* 197 Or 553, 563, 252 P2d 816 (1953)), and it makes no difference whether the displacement was one of an upstream-downstream nature or lateral. *Wimmer v. Compton,* 277 Or 313, 560 P2d 626 (1977). The trial court properly left trespass to the jury.

The jury awarded special damages for mental anguish. Two of defendants' assignments relate to that element of the case. The first is based on the court's refusal to strike the parts of the complaint alleging mental anguish. The motion raised the sufficiency of the evidence to go to the jury. Defendants also challenged the trial court's instructions.

Ordinarily, mental anguish is not compensable in a trespass case; but it is properly within the jury's function to take it into account where it is "the direct and natural result of a specific trespass." *Douglas v. Humble Oil,* 251 Or 310, 445 P2d 590 (1968). Here the testimony of Mr. Senn relating specifically to the effect defendants' trespassory conduct had on him is sparse: he said it upset him continually and that he kept wondering what was going to happen next. In addition, his testimony, taken as a whole, describing the actions of the defendants has a strong flavor of anguish about it, and permits the inference that he did genuinely suffer mental anguish. The jury was entitled to believe him, and other evidence in support of such damages may be "supplied by aggravated conduct on the part of the defendant." *Fredeen v. Stride,* 269 Or 369, 373, 525 P2d 166 (1974).

In *Fred Meyer v. Bureau of Labor,* 39 Or App 253, 592 P2d 564 (1979), we upheld an award of damages for humiliation where the testimony of the claimant was "scant" on that point; we said that the "evidence of harrassment is so substantial that the inference is reasonable that Hayes suffered humiliation as a consequence." 39 Or App at 265. In *Douglas, supra,* the Supreme Court said the evidence of what had occurred with respect to the trespass was such that plaintiff "was understandably disturbed by the experience." 251 Or at 317.

The evidence as to defendants' conduct over a long period of time which resulted in a continuous interference with the use and enjoyment of plaintiffs' land is substantial, and taken together with Mr. Senn's testimony that it upset him is sufficient to submit the question to the jury. *Cf. Edwards v. Talent Irrigation District,* 280 Or 307, 570 P2d 1169 (1977).[1]

---

[1] The dissent makes the point that the Supreme Court in *Edwards v. Talent Irrigation District,* 280 Or 307, 570 P2d 1169 (1977), limited its holding to nuisance cases. It is true that the Court made such a statement in note 4, 280 Or at 310. The dissent, however, overlooks the fact that the

■ The trial court's instruction,[2] while terse, was a correct statement of the law. It is difficult to see how any amplification of it would have benefitted defendants. The instruction on punitive damages, to which no objections were made, covered the elements of aggravated conduct, and it is apparent by the jury award of punitive damages that it found those elements present.

The final question is whether the evidence supports the submission of punitive damages.

In *McElwain v. Georgia-Pacific,* 245 Or 247, 249, 421 P2d 957 (1966), the Supreme Court said:

> "Although this court has on occasion indulged in the dictum that punitive damages are not 'favored in the law,' it has, nevertheless, uniformly sanctioned the recovery of punitive damages whenever there was evidence of a wrongful act done intentionally, with knowledge that it would cause harm to a particular person or persons. \*\*\* Malice is the term most frequently used in our decisions to define a state of mind that will justify the imposition of punitive damages. Malice, as a basis for punitive damages, signifies nothing more than a wrongful act done intentionally, without just cause or excuse. \*\*\* The intentional disregard of the interest of another is the equivalent of legal malice, and justifies punitive damages for trespass. \*\*\* Where there is proof of an intentional, unjustifiable infliction of harm with deliberate disregard of the social consequences, the question of award of punitive damages is for the jury. \*\*\*" (Citations omitted.)

---

Court correctly pointed out that "nuisance" only characterizes the interest invaded—namely the right of use and enjoyment of real property—and does not define the type of conduct which subjects the actor to liability. *See* 280 Or at 309-10, note 2. The invasion of the property right may be intentional or negligent; in *Edwards* it was negligent, yet damages for mental suffering were sustained.

[2] The court instructed the jury as follows:

"Mental distress is compensible if such distress is the natural and probable result of defendant's trespass."

[40]

More succinctly, it has been stated that "it is proper to use the sanction of punitive damages where there has been a particularly aggravated disregard" of the rights of others and "where the violation of societal interests is sufficiently great and of a kind that sanctions would tend to prevent ***." *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306, 27 ALR3d 1268 (1967). The impact of punitive damages is supposed to be a "civilizing influence." *Douglas v. Humble Oil, supra,* 251 Or at 316.

It is not necessary for plaintiffs to show actual malice or ill will on the part of defendants. It is enough if the evidence is sufficient to permit the jury to conclude the defendants' conduct amounted to an intentional disregard of the plaintiffs' rights.[3] At the heart of all the punitive damages cases is the idea that in some instances deliberate or careless conduct is so much in disregard of the rights of another that it should lay the actor open to monetary punishment that would tend to deter that sort of conduct in the future. *See* Hodel, *The Doctrine of Exemplary Damages in Oregon,* 44 Or L Rev 175, 183-86 (1965). The term "smart money"is ancient and apt.

The defendants' reliance on *Baumbach v. Poole,* 266 Or 154, 511 P2d 1219 (1973), is misplaced. We do not view that case as limiting, in any way, the holding in *McElwain.* In *Baumbach* the defendant, in order to develop his land, needed to provide a better road than

---

[3] The dissent contends that *Chamberlain v. Jim Fisher Motors, Inc.,* 282 Or 229, 578 P2d 1225 (1978), precludes an award of punitive damages here. The only similarity between that case and this one is that in each there was a claim for punitive damages. *Chamberlain* involved a statutory claim for failure to provide plaintiff a certificate of title to the automobile plaintiff purchased from defendant; the car was stolen and plaintiff's insurer refused to pay in the absence of a certificate of title. There was no evidence that defendant intentionally refused to provide the certificate, and plaintiff did not so allege, or that defendant knew there would be any difficulty in obtaining one. The only evidence was that defendant was slow about obtaining one and had not done so within the six-week period between the sale and theft. The Supreme Court stated that it was improper for the trial court to have instructed the jury that "wanton misconduct" includes "not only 'deliberate disregard' of the rights of others, but also a 'reckless indifference to such rights.'" 282 Or at 237-38.

[41]

the one in use, which, for the most part, followed an easement through the plaintiff's land. Before going ahead with the work, he employed an engineer to locate the boundaries of the easement, and in constructing his new road he stayed within the boundaries as determined by his engineer. It was not until after the road was completed, and the plaintiff had the easement resurveyed, that it was determined that a portion of defendant's new road encroached on plaintiff's land. On those facts, the Supreme Court held that the issue of punitive damages should not have been submitted to the jury.

Obviously, awarding punitive damages against a defendant who took pains to avoid encroachment, and who honestly and reasonably believed he was not encroaching, would not promote societal interests by deterring others in the future. That, however, cannot be said of the case at bar. Here the jury would be entitled to find that the defendants decided that in order to develop their land, it was necessary to fill those portions of it adjacent to the plaintiffs' property, and without making any effort to determine the boundary lines, or to talk things over with plaintiffs in advance, proceeded to do whatever they felt they had to do to improve their land, and without regard to what the consequences might be to the plaintiffs' land.

It is apparent from the size of the punitive damage award that the jury viewed the facts that way, and while the verdict is large, it was within their province to assess the damages.

Affirmed.

**JOSEPH, J.,** concurring in part and dissenting in part.

I concur wholeheartedly with the majority up to the point where it begins to discuss the jury's special damage award for mental anguish. To that point the opinion is cogently reasoned and beautifully written. I dissent from the rest of the opinion.

[42]

The majority correctly notes:

"Ordinarily, mental anguish is not compensable in a trespass case; but it is properly within the jury's function to take it into account where it is 'the direct and natural result of a specific trespass.'" *Douglas v. Humble Oil,* 251 Or 310, 445 P2d 590 (1968).

The trial judge in colloquy with counsel stated his view that "if there is evidence that the wrongful action of the defendant caused a mental or emotional distress on the part of the plaintiff, that can be considered as part of the damages suffered ***." The generality of the *Douglas* rule, which in terms seems to be one only of causation, has been limited by later cases.

In *Fredeen v. Stride,* 269 Or 369, 373, 525 P2d 166 (1974), a conversion case, it was said that "mental suffering is a proper element of damages where evidence of genuine emotional damage is supplied by aggravated conduct on the part of defendant." More recently the Supreme Court, in a nuisance action involving the seepage of water from an irrigation ditch (where there was evidence of expenses for draining the excess water, malfunction of sewage facilities, death of trees and "garden failure," as well as evidence of mental suffering as a result of concern for the damage to their property), plaintiffs' judgment which included compensation for that suffering was sustained. *Edwards v. Talent Irrigation District,* 280 Or 307, 570 P2d 1169 (1977). *But* the court was careful to point out that the holding there was limited to cases based on nuisances, and it specifically avoided any attempt to alleviate the acknowledged confusion existing in the law.

I do not believe that this case calls for an extended analysis of the law applicable to claims of mental anguish either, for I would conclude that the trial court erred in submitting the claim to the jury because the quantum of evidence was insufficient. There were activities chargeable to defendants which amounted to trespasses, and there was evidence of permanent

[43]

damage to plaintiffs' property. The general damages awarded were compensation for those wrongs. *See Hudson v. Peavey Oil Company, supra,* 279 Or at 10. In their brief plaintiffs recite the separate elements of the course of events and repeatedly assert that they "must have been" "frustrating," "traumatic" and "upsetting," or they "must have" made plaintiffs feel they were being imposed upon.

The record does not disclose all of that. After defendants had moved to strike the mental anguish claim as unsupported by any evidence, and after the court had indicated it would allow the motion, plaintiffs received permission to reopen their case to recall Mr. Senn. His entire testimony is set out in the margin.[1] That testimony was not sufficient to carry the burden of showing that he suffered "genuine emotional damage" in any special sense different than that which would flow from any substantial interference with the use and enjoyment of property. Mrs. Senn did not testify at all.

We would be authorized simply to strike the award of special damages from the judgment were it clear that the $5,000 was entirely for emotional damages. *Baumbach v. Poole,* 266 Or 154, 160, 511 P2d 1219 (1973). Plaintiffs also asked for other special damages for the cost of restoring pasture and the cost of keeping their livestock on other land while the fence was down. Because we cannot determine whether the amount of special damages encompassed more than mental anguish, we should remand the case for retrial on the limited issue of special damages.

I find in the record no evidence of actual malice or ill will toward the plaintiffs. The trial judge read

---

[1]    "Q. Mr. Senn, did this course of conduct by the defendant to which you have testified, cause you any mental anguish and suffering, frustration or humiliation?

"A. Yes, very much so.

"Q. Will you describe?

*McElwain v. Georgia-Pacific,* 245 Or 247, 421 P2d 957 (1966), as supporting punitive damages whenever there is evidence of the intentional disregard of the rights of others. That is too broad a reading to give the language the majority quotes from Supreme Court cases. And it is utterly inconsistent with the Supreme Court's recent holding in *Chamberlain v. Jim Fisher Motors, Inc.,* 282 Or 229, 237, 578 P2d 1225 (1978), "that gross negligence or recklessness is not, in and of itself, sufficient to support an award of punitive damages."

The wrongful conduct of defendants consisted of related but separate acts, which fairly should be characterized in somewhat different ways. The destruction of the fence was the result of carelessness in doing the intentional act of leveling certain of the lots, as was the spreading of dirt onto plaintiffs' property. I do not believe the situation (which was subsequently substantially corrected by the erection of a new fence and the removal of most of the spillover) was of such a nature as to warrant the award of punitive damages. Although the defendants' conduct in this instance was somewhat more egregious than that described in *Baumbach v. Poole, supra,* what had happened there caused more severe and permanent harm than was caused in this instance. Still it was held not to support punitive damages. The diversion of the creek in the course of building the coffer dam was temporary or intermittent and inadverent; not only that, but there was evidence that the defendants used proper and necessary techniques in the process of building it. The taking of some dirt from plaintiffs' land to build the coffer dam may well have been inadvert, due to doubt about the boundary lines of the sewer easement,

"A. Well, from the time it started until I got down to the—to where I had to hire an attorney, I was upset all the time. In fact, it caused me not able to carry on with my own work. I was always on [*sic*] my home and when I got home at night I wondered what was happening next because I could not keep my mind on any of it."

[45]

but it was certainly not of the societal significance that would warrant punitive damages.[2]

The only harm done that the evidence showed was permanent, perhaps irremedial, and had consequences which would substantially affect plaintiffs' use and enjoyment of their property was the closure of the southerly of the two stream channels. The evidence was that during times of heavy runoff, and then for brief periods of hours or at most two or three days, a heavier flow of water was cast into the remaining old channel, that some new channeling had been cut through the formerly somewhat swampy meander areas around the old stream bed, and that at flood time the water rises somewhat higher than formerly and, of course, now entirely on plaintiffs' land. Also, there was some, although not clearly delineated, increase in erosion in limited areas.

There was no evidence that the plaintiffs' utilization of their property for livestock or other domestic activities was at all permanently diminished. That future development of the property was discouraged or made less feasible, though suggested by one witness, was taken out of the case by Mr. Senn's own testimony that he had no present plans for the land other than to have it in the forest land tax classification it is now in—and that classification was not affected by defendants' actions.

Defendants did not adequately consider the effects of their actions on plaintiffs' interests, and they thereby cast some burden on plaintiffs that they ought not to have. Nonetheless, I do not believe that the evidence, taken by the whole, showed "a particularly aggravated disregard" for consequences that warranted the trial court's submission of punitive damages to the jury.

---

[2] I note here that defendants did not move against punitive damages in the discrete ways the foregoing suggest they might have done. Their approach was "whole hog or none." Furthermore, nothing is before us respecting the trial court's instructions on punitive damages.

SCHWAB, CHIEF JUDGE, LEE, J., and TANZER, J., join in this opinion.