Argued and submitted April 8, 2014, affirmed April 29, 2015

David GIBSON,
Trustee of the David Gibson Trust
u/a/dated December 21, 2004;
and Valerie M. Gibson,
Trustee of the Valerie M. Gibson Trust
u/a/dated December 21, 2004,
*Plaintiffs-Appellants,*

*v.*

William M. MORRIS
and Karen L. Morris,
Co-Trustees of the William M. Morris
Lifetime Trust dated January 5, 1994,
and the Karen L. Morris Lifetime Trust
dated January 5, 1994,
*Defendants-Respondents.*

Clackamas County Circuit Court
LV11070743; A152724

348 P3d 1180

John M. Berman argued the cause and filed the briefs for appellants.

Steven C. Burke argued the cause for respondents. With him on the brief was Case & Dusterhoff, LLP.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

## SERCOMBE, P. J.

In this action for trespass and nuisance, plaintiffs alleged that, when defendants, owners of neighboring upslope property, replaced their septic system, they caused water to intrude onto plaintiffs' property in a greater quantity, and at a different location, than water had historically drained. Specifically, plaintiffs claimed that defendants' "groundwater interceptor"—a long, narrow, and deep trench that collected water and sent it through a pipe that exited downslope from the septic system—collected surface and groundwater on defendants' property and diverted it directly onto plaintiffs' property. After a bench trial, the court found that the groundwater interceptor had, in fact, improperly collected and diverted water onto plaintiffs' property.[1] Nevertheless, the trial court held that plaintiffs' trespass and nuisance claims failed because plaintiffs had not shown that defendants' actions were either intentional or negligent. That is, the trial court found that defendants did not know, and acted reasonably in not discovering, that the groundwater interceptor caused water to improperly intrude onto plaintiffs' property—either when the system was first installed or when plaintiffs complained to defendants about water coming onto their property. On appeal, plaintiffs assert that the trial court erred in making that

---

[1] The parties agree that defendants had the right to have their property naturally drain surface and ground water onto plaintiffs' property, but they did not have the right to artificially collect and redirect the water in a way that changed the quantity of water that naturally flowed, and the place where the water naturally flowed, onto plaintiffs' property. In this opinion, then, references to an "improper" intrusion of water are to the collection and redirection of water in a way that changed the flow's quantity and location when compared to the natural flow.

We also note that the parties rely on cases involving surface water in support of the above proposition. *See Rehfuss v. Weeks*, 93 Or 25, 32, 182 P 137 (1919) ("The defendant as a landowner had the right to turn or expel upon the land of an adjacent owner, surface water that would naturally flow there, and in such quantities as would naturally drain in such direction, without liability for damages."); *Garbarino v. Van Cleave et al*, 214 Or 554, 557-58, 330 P2d 28 (1958) (reasoning that the "defendants had the right to install and use a system to drain the surface water from their lands into natural channels even though they thereby accelerated the flow of water onto the lower lands of plaintiff," but noting that the plaintiff did "not allege that defendants changed the place where the surface water from their property naturally flowed onto plaintiff's lands"). We assume that those rules apply in this case, which involves allegations of the collection and diversion of both surface and ground water.

finding because the only factual determination supported by the evidence is that defendants knew or should have known that their groundwater interceptor would divert or was diverting water onto plaintiffs' property. For the reasons below, we reject that argument and, accordingly, affirm.

We state the facts consistently with the trial court's findings and in the light most favorable to defendants, who prevailed at trial. *Sutherlin School Dist. #130 v. Herrera*, 120 Or App 86, 91, 851 P2d 1171 (1993). Defendants have lived in a home on their property for several decades. Their property is to the north of plaintiffs' property, and water in their backyard naturally travels on a southeastern path along a slope toward plaintiffs' property. In 2007, the septic system in defendants' backyard failed, and they contracted with an installer to replace it. As part of the permitting process for the replacement, a soil scientist from Clackamas County evaluated the backyard soil and issued a report specifying the general type of septic system to be installed and where it should be placed based on "test pits" dug in the backyard.

The county also required the installation of a "groundwater interceptor" to protect the drainage field where water exited the septic system. The groundwater interceptor—a narrow, deep, and long trench built upslope from that drainage field—diverted surface water and groundwater around the drainage field, ensuring that the soil in the field could absorb water from the septic system. As built, the interceptor trench on defendants' property was three feet deep, one foot wide, and filled with gravel; it extended 70 feet upslope of the drainage field. A perforated four-inch pipe running along the bottom of the trench collected water and took it to a solid four-inch pipe that ran underground down the slope, for about 100 feet, until it met daylight. The above-ground point where the pipe released water was about 36 feet from plaintiffs' property.

Sometime after defendants installed the groundwater interceptor, plaintiffs noticed that the edge of their property bordering defendants' property was quite muddy and soggy. They had noticed that the property was muddy

before, and, in 2001, built a six-inch-deep trench along the property line that would fill with about four inches of water from time to time. As of 2007, however, plaintiffs observed "a significant increase in the amount of water that was coming off of [defendants' property]." After deepening the ditch to address the water, in 2010, plaintiffs built a French drain that drained to a creek on their property.

In November 2010, plaintiffs sent defendants a letter, stating that they had "noticed an extremely large amount of water flowing from" defendants' property to plaintiffs' property. The letter identified the groundwater interceptor as the cause, though it also asserted that defendants had "connected a [12-inch] concrete drain pipe to the culvert running under [the road in front of defendants' house], extending [100 feet] to an open ditch on the west side of [defendants'] property where it flows south onto [plaintiffs'] property." Plaintiffs "demand[ed] that within 30 days of the date of this letter, you install dry wells to which you pipe the water you are diverting and collecting and prevent it from running onto our property."

After receiving the letter, defendants contacted the septic system installer, who suggested that defendants talk to someone from the county. Two county officials, Garity and Patterson, came out to inspect the property for one or two hours on a day following a heavy rain storm. Garity, a licensed water-rights examiner and inspection supervisor of the county engineering division, observed that water flowing out of the interceptor exit pipe dissipated and went back into the ground within five to 10 feet of the exit point. In Garity's view, the groundwater interceptor had not changed the flow of water from defendants' property onto plaintiffs' property. Garity's assistant, Patterson, concurred with that assessment, stating that he thought that defendants "had left sufficient space for the water [flowing out of the exit pipe] to be able to sheet-flow and do what it *** would do naturally anyways." Garity also told defendants that the ground wells that plaintiffs had demanded would not be effective because the soil in the area had an extremely hard and impermeable layer about two feet below the surface. Garity

sent defendants a written summary of his views, a "Sketch of Drainage Complaint Investigation," and an "Inspection Summary" that Patterson prepared.

Relying on those materials and advice from county officials, defendants did not believe that the groundwater interceptor was sending water improperly onto plaintiffs' property. They responded to plaintiffs' letter stating as much, explaining that they had spoken to the county officials. Defendants also explained that the culvert under the road in front of their house and the ditch connected to it were "today just as they were when [defendants] purchased the home in 1967."

Plaintiffs filed suit for trespass and nuisance soon thereafter, seeking $7,500 in damages, an injunction to stop "defendants from diverting the water from their [groundwater interceptor] to [plaintiffs' property]," and attorney fees. The legal principles supporting plaintiffs' claims were undisputed at trial (and are not disputed on appeal). Plaintiffs' trespass and nuisance claims each "involve[] a different kind of interference with plaintiffs' interest in their land: '[A]n actionable invasion of a possessor's interest in the exclusive possession of land is a trespass; an actionable invasion of a possessor's interest in the use and enjoyment of his land is a nuisance.'" *Carvalho v. Wolfe*, 207 Or App 175, 178, 140 P3d 1161 (2006) (quoting *Martin et ux v. Reynolds Metals Co.*, 221 Or 86, 90, 342 P2d 790 (1959), *cert den*, 362 US 918 (1960)). Both claims require plaintiffs to show that the intrusion was intentional or, if unintentional, the result of defendants' negligence or ultrahazardous activity. *Carvalho*, 207 Or App at 180-81. "'Intentional' is used in this context to mean that the acts setting in motion the invasion were done with knowledge that a trespass would result and not that the acts were done for the specific purpose of causing a trespass or injury." *Lunda v. Matthews*, 46 Or App 701, 705, 613 P2d 63 (1980). Conduct may also be intentional when "there is a *continuing* intrusion known to the intruder that he allows to persist," even if the intruder did not know that an invasion would result at the time the acts "setting in motion the invasion" were done. *McGregor v. Barton Sand & Gravel, Inc.*, 62 Or App 24, 31 n 5, 660 P2d

175 (1983) (emphasis in original).[2] Plaintiffs may also prevail on a claim for negligent trespass or nuisance by showing that, when defendants acted, they should have known the intrusion would result. *Hudson v. Peavey Oil Company*, 279 Or 3, 7, 566 P2d 175 (1977). Consistent with those principles, plaintiffs argued that defendants knew or should have known that "they were piping groundwater and surface water onto Plaintiffs' land" as of 2007, or at least knew or should have known of an ongoing intrusion when plaintiffs complained about the water in 2010.

The trial court, in oral remarks made at the end of trial, first addressed whether defendants' groundwater system had, in fact, caused an improper intrusion of water onto plaintiffs' property. On that question, the court had heard conflicting evidence (including opposing opinions from two expert witnesses), and it resolved that evidence in plaintiffs' favor: "[T]he greater weight of the evidence * * * seems to be that it was that system that caused the water to be diverted, and then it resulted, essentially, in an accumulation or a concentration of water at the south end of [defendants'] property. And that moved onto [plaintiffs'] property."

In assessing plaintiffs' theory that, in 2007, defendants knew or should have known that the groundwater interceptor would cause water to intrude on plaintiffs' property beyond what would occur with ordinary drainage, the court determined that defendants did not have "any idea that the water was going to drain down into the neighbors' property." When considering what defendants knew or should have known in 2010, after they received plaintiffs' letter, the court identified the "core issue" as whether plaintiffs could "prevail in light of the information that [defendants] had received from the county":

> "[Defendants] received the notice from the [plaintiffs], and * * * then [defendants] * * * did something about it. They contacted the county; the county came out. And Mr. Morris's

---

[2] *McGregor* imposed liability for intentional trespass in a case where the intruder knew of a persistent intrusion and allowed it to persist. Here, plaintiffs extend that theory to negligent conduct, arguing that defendants are liable for negligent trespass and nuisance because they *should have known* of the intrusion and allowed it to persist. For purposes of this appeal, we assume that the rule in *McGregor* extends to negligent conduct.

testimony was that Mr. Garity had arrived and looked at the entire system and concluded that [defendants] were not causing the problem. So that appears to create a problem in proving the intentional trespass where you've got competing notices."

The court expressed "real concerns" as to whether plaintiffs could recover for intentional or negligent trespass or nuisance on those facts and took the matter under advisement. The court later ruled, in a letter opinion, "as it stated it was inclined to rule" when it made its oral rulings. The court explained that, "[a]lthough [it] * * * ruled in plaintiffs' favor on causation, more than proof of causation is required in order to prevail on the trespass and nuisance claims. As stated in court, a water intrusion case of this nature is not a strict liability offense."[3]

On appeal, plaintiffs argue that the trial court erred in finding that defendants did not know of an intrusion beyond what would occur with ordinary drainage and were reasonable in believing that their actions would not result, and were not resulting, in that kind of intrusion onto

---

[3] Plaintiffs also argued that defendants were negligent in constructing the groundwater interceptor and that negligence caused the intrusion of water on plaintiffs' property. As plaintiffs described it in a pretrial memorandum, defendants' negligence related to "the manner and location in which the [groundwater interceptor] and the drainfield were constructed and the failure to mitigate the water being diverted." In argument at trial, plaintiffs elaborated that "the groundwater interceptor * * *—you know, where it's located is negligence. And because it's capturing water from that metal pipe, because [the interceptor trench] was rocked to the top and because where [defendants] have it located, they don't mitigate the water that they're causing to be concentrated in one course at the south end of their property." The trial court rejected that theory of liability:

"And I also am not inclined to believe that [defendants] were negligent in how they constructed this system. They're working with other professionals, and the system was placed in a location which appeared to be appropriate. And they certainly didn't want to have a disaster on their hands by having water get into that drain field or the septic system, so it was diverted."

Plaintiffs do not appear to challenge that determination on review. Rather, they argue that defendants' knowledge of the structure itself in 2007, or their knowledge of the structure itself and plaintiffs' assertion that it was causing water to enter their property, compelled the trial court to find that defendants knew or should have known that the groundwater interceptor was diverting and concentrating water on plaintiffs' property. To the extent that plaintiffs on appeal challenge the trial court's conclusion that defendants were not negligent in how they constructed the system, we conclude that the trial court's determination is supported by the evidence.

plaintiffs' property. Plaintiffs contend that, once defendants installed the groundwater interceptor in 2007, they "should have known at all times that they would be causing Plaintiffs' property to be flooded." They claim that "what the [groundwater interceptor] did was act as a giant funnel" and that "[a]nyone who created such a structure should know that it is going to have a material impact on the property below the exit pipe." Alternatively, plaintiffs argue that, regardless of what defendants knew when the groundwater interceptor was installed in 2007, they knew or should have known that the interceptor was sending water onto plaintiffs' property when they received plaintiffs' letter in 2010 asserting that defendants had engaged in "water trespass." In plaintiffs' view, defendants' consultation with officials from the county did "not rise to the level of adequate due diligence" because those officials' views were "erroneous," "casual," and "informal." In support of that characterization, plaintiffs fault defendants for failing to consult a "geotechnical expert" and point out what they perceive as limitations in the opinions from the county officials—that the officials' "primary purpose" was to make sure that the culvert under the county road was not causing a problem, and that they told defendants that they were not "attorneys or hydrologists."

The fundamental problem with those arguments— arguments that mirror the arguments plaintiffs made to the trial court—is that they are incompatible with our standard of review. The question as to what defendants knew or should have known, under the circumstances as they existed in 2007 or 2010, was a question of fact for the finder of fact—here, the trial court. *See, e.g., Senn v. Bunick,* 40 Or App 33, 38, 594 P2d 837, *rev den,* 287 Or 149 (1979) (rejecting argument on appeal that trial court erred in refusing to strike the plaintiffs' claim for trespass based on construction of a dam, where there was "sufficient evidence *from which the jury could find* that [the] defendants knew or should have known what they were doing, and they knew or should have known of potential effects on [the] plaintiffs" (emphasis added)); *see also Kaseberg v. Davis Wright Tremaine, LLP,* 351 Or 270, 278, 265 P3d 777 (2011) (explaining that, in determining the point when a plaintiff should know of legally cognizable injury, the court

"applies an objective standard—how a reasonable person of ordinary prudence would have acted in the same or a similar situation," and that generally "presents a factual question for determination by a jury").[4] When a party challenges the findings of a trial court sitting as a factfinder, our review is limited to the narrow issue of whether there is any evidence to support the trial court's findings. *Hassan v. Guyer*, 271 Or 349, 352, 532 P2d 227 (1975); *Herrera*, 120 Or App at 91 (stating that standard for claim of intentional trespass). We will not overturn the trial court's determination as to what a party knew or should have known unless we can say, as a matter of law, that there is *only* one factual determination supported by the evidence, and the trial court reached a contrary conclusion. *See Hudson*, 279 Or at 7 (explaining that what a plaintiff knew or should have known in trespass action could not be decided as a matter of law where there was conflicting evidence on that issue); *Kaseberg*, 351 Or at 278 (explaining that determination as to whether a plaintiff should have known of cognizable injury presents a "factual question for determination by a jury unless the only conclusion that a jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter").

---

[4] Plaintiffs suggest that our "review is for an error of law," relying on cases discussing what is required to meet the fact-pleading requirement in alleging the foreseeability element of a negligence claim. In *Moore v. Willis*, 307 Or 254, 259, 767 P2d 62 (1988), for example, the court explained that "[w]hether a defendant should have known something is a judgment about a particular set of circumstances rather than a fact from which conclusions are drawn. An allegation that a defendant knew something may be an allegation of fact, but an allegation that he should have known something is merely a *conclusion drawn from other facts*." (Emphasis added.) From that, plaintiffs argue that what a defendant "should have known" is a legal conclusion that we should review for errors of law.

But *Moore* further explains that, "[w]hen a plaintiff claims that a risk was foreseeable, though not necessarily foreseen, the plaintiff must allege facts that would allow *the factfinder* to conclude that the defendant should have known of the risk." *Id*. (emphasis added). Thus, although it is true that what a person should have known is a "conclusion drawn from other facts," it remains an innately *factual* conclusion that is ordinarily left for the factfinder—here, the trial court. *See, e.g., Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17-18, 734 P2d 1326 (1987) ("'The jury is given a wide leeway in deciding whether the conduct in question falls above or below the standard of reasonable conduct deemed to have been set by the community. The court intervenes only when it can say that the actor's conduct clearly meets the standard or clearly falls below it.'" (quoting *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 607, 469 P2d 783 (1970))).

To endorse plaintiffs' arguments on review, then, we must conclude, as a matter of law, that the only factual determination supported by the evidence is that defendants knew or should have known that their groundwater interceptor would divert or was diverting water onto plaintiffs' property. At best, plaintiffs' arguments demonstrate that the evidence in this case might have permitted that determination, not that that was the *only determination* that could have been drawn from the evidence.

The Supreme Court's decision in *Hudson* illustrates that principle. In that case, the plaintiffs noticed an overwhelming odor of gasoline on one end of their property, which was near multiple service stations. 279 Or at 5, 7. When the plaintiffs inquired at the station next door to see if one of the station's gasoline storage tanks might be leaking, the station's employees told the couple, after checking their tanks and sales records, that the station was not losing any gasoline from its tanks. *Id.* at 5. Several months later, the plaintiffs dug a trench and discovered that the station's tanks were leaking, and they sued the station for trespass. The question on review was whether the evidence permitted the determination, as a matter of law, that the station knew or should have known of the gasoline seepage before the plaintiffs dug the trench.[5] Although the court determined that "[t]here was evidence which would have *permitted* the jury to find that [the station] was negligent in failing to discover the leak in the tank sooner than it did," *id.* at 9 n 4 (emphasis added), the court concluded that "the evidence would not have justified a ruling that defendant knew or should have known of the gasoline seepage *as a matter of law,*" *id.* at 7 (emphasis added). The court noted that, until the couple dug the trench, "so far as the parties knew, the gasoline on plaintiffs' property might have been coming from other sources,

---

[5] The trial court, over the station's objection, "instructed the jury, in effect, that [the station] was strictly liable for any damages caused by the seepage of its gasoline" onto the plaintiffs' property. *Hudson,* 279 Or at 6. In assessing that instruction, the Supreme Court explained that, because "liability for trespass will not be imposed for an unintentional trespass unless it arises out of defendant's negligence or the carrying on of an extrahazardous activity," the instruction was "proper only if [the station's] trespass was either intentional or negligent as a matter of law or if [the station's] storage of gasoline constituted an extrahazardous activity." *Id.* at 6-7.

including other service stations which were located nearby. There was also evidence that during this period [the station's] normal record-keeping did not disclose any gasoline shortages from its tanks." *Id.*

Here, as in *Hudson*, the evidence presented to the trial court did not compel a finding that defendants knew or should have known about the improper water intrusion when the groundwater interceptor was installed in 2007 or when plaintiffs complained about water entering their property in 2010. As to what defendants should have known when the interceptor was installed, plaintiffs point to the physical attributes of the system—that it was a long, deep trench (a "giant funnel") that sent water to an exit point 36 feet from plaintiffs' property—and draw the inference, from those attributes alone, that defendants should have known that the interceptor would cause a water intrusion. But there was evidence from which the trial court could draw a contrary inference. At the time the septic system was installed, defendants understood that the county had required the groundwater interceptor and imposed minimum requirements on its design, and they understood that, to prevent saturation of the drain field, the interceptor captured and sent water out an exit pipe. Beyond that, there was no evidence that anything told to them by the installers or the county officials, or anything defendants knew about the system itself, suggested that the interceptor would do more than keep water out of the septic system drain field— that it would increase the quantity of, and change direction of, water draining from their property. Defendants testified that they never noticed large amounts of water coming out of the pipe and that the southern, downslope end of their property had been marshy long before the groundwater interceptor was installed. In light of that evidence, we cannot conclude, as a matter of law, that defendants acted negligently in failing to forecast that the groundwater interceptor would concentrate and divert water onto plaintiffs' property.

Plaintiffs likewise question defendants' reliance on the opinions they received from county officials in 2010 (that the interceptor was not sending water onto plaintiffs' property beyond what would occur with ordinary drainage), but

there was evidence establishing that defendants reasonably relied on advice from county officials and discounted plaintiffs' complaints.[6] It was the county that required the groundwater interceptor, and so defendants contacted the county when they were alerted to a possible problem with its operation. Regardless of whether the county had any legal responsibility for the interceptor's function, county officials conducted an on-site inspection as part of what they identified as an "investigation," and they assessed whether the system was causing the problem that plaintiffs had identified in their letter. The officials also explained to defendants that, even if there was a problem, the dry wells demanded by plaintiffs would be ineffective, suggesting that plaintiffs might have been mistaken about the flow of water onto their property. That evidence supports the trial court's finding that defendants reasonably credited the county officials' assessment over the accusations in plaintiffs' letter, even if it might have permitted the court "to find that [defendants were] negligent in failing to discover" that the interceptor was causing an improper intrusion. *Hudson*, 279 Or at 9 n 4. We cannot say that the only determination that the evidence allowed was that plaintiffs were unreasonable in concluding that the groundwater interceptor was not sending water onto plaintiffs' property beyond what would occur with ordinary drainage. Thus, we reject plaintiffs' assignment of error.

Affirmed.

---

[6] Plaintiffs also argue—in direct contradiction to their suggestion that defendants acted unreasonably in not consulting an expert—that the outside opinions that defendants received were "legally and factually irrelevant" because "[w]hether one should know that the [groundwater interceptor] would cause flooding to [plaintiffs'] property is based solely on the physical attributes of the system." Plaintiffs cite no authority for that categorical proposition, and we are aware of none. As the trial court observed, adopting that rule would mean that defendants—neither of whom had any expertise in the groundwater system that was installed—would be liable for trespass and nuisance, even if the world's foremost expert in hydrology, drainage, and groundwater systems had counseled them that their system was not causing a problem. We agree with the trial court that the opinions of county officials were relevant in assessing whether defendants acted reasonably.